IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HANGER PROSTHETICS & ORTHOTICS, INC., | ) ) | 2:06-cv-2879-GEB-KJM |
| | ) | ORDER* |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CAPSTONE ORTHOPEDIC, INC., a California Corporation; GLEN ELLIS, an individual; SANTIAGO ROSALES, an individual; DAVID KIMZEY, an individual; ANGELA FULTON; an individual, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

On February 7, 2007, Defendants Santiago Rosales
("Rosales"), Glen Ellis ("Ellis"), David Kimzey ("Kimzey"), Angela
Fulton ("Fulton") and Capstone Orthopedic, Inc. ("Capstone"),

---

\* This matter was determined to be suitable for decision without oral argument.  L.R. 78-230(h).

1

1  ("Defendants") filed motions for summary judgment on all of

2  Plaintiff's claims against them.  (Dkt. Nos. 63, 64, 65, & 66.)

3  Plaintiff opposes the motions.

4  BACKGROUND

5      Plaintiff Hanger Prosthetics & Orthopedics, Inc. ("Hanger")

6  operates prosthetic and orthotics patient care centers in the cities

7  of Tracy and Visalia, California.  (Compl. ¶ 5.)  Hanger's patient

8  care centers maintain hard-copy and electronic patient files that

9  include patient medical, referral source, and contact information.

10  (Alltucker Decl. ¶¶ 9, 11, 12.)  This information is not available to

11  the public and Hanger treats it as confidential, having employees

12  sign Employment Confidentiality/ Training Attestations directing that

13  the information should only be used for business purposes and giving

14  employees computer passwords.  (Id. ¶¶ 9, 10, 12, 13; Schwarcz Decl.

15  Exs. H, N (Confidentiality Attestations).)

16      Ellis held the position of Regional Vice President for

17  Hanger's Northern California region from 2000 until his resignation on

18  July 14, 2006. (Schwarcz Decl., Ex. D ("Ellis Depo.") 20:8-21, 109:7-

19  12.)  Ellis is the chief executive officer of Capstone, which was

20  formed on July 21, 2006, and is a business competitor of Hanger in the

21  Northern California marketplace.  (Ellis Dep. 112:11-12, 113:19-21,

22  167:18-168:1.)  Ellis's employment contract with Hanger contains a

23  non-solicitation clause prescribing that for two years after Ellis

24  ceased being employed at Hanger he was not to solicit Hanger patients

25  or employees.  (Schwarcz Decl., Ex. R § 5 (b).)

26      Rosales was a Practice Manager for Hanger's Tracy patient

27  care center, where he was responsible for the center's daily

28  operations. (Schwarcz Decl., Ex. C ("Rosales Dep.") at 19:25.)  Kimzey

was a Branch Manager for Hanger's Visalia patient care center.

(Schwarcz Decl., Ex. B ("Kimzey Dep.") at 19:22.)  Fulton is Kimzey's

daughter and held the position of Office Administrator/Soft Goods

Fitter at Hanger's Visalia center. (Schwarcz Decl., Ex. A ("Fulton

Depo.") at 7:23-24, 21:5-8, 22:3-11.)

On December 21, 2006, Plaintiff filed a Complaint against

Defendants alleging that "Ellis began to form a scheme to steal

Hanger's Confidential Information and take over Hanger's Northern

California business in or around May 2006 while he was" employed at

Hanger.  (Compl. ¶ 40.)  Plaintiff further alleges that Ellis

solicited other Defendant Hanger employees to work at Capstone.  (Id.

¶ 43, 42, 44.)  Plaintiff's claims against Defendants include federal

computer fraud and abuse, state computer abuse, trade secret

misappropriation, conversion, interference with prospective economic

advantage, unfair competition, civil conspiracy, breach of contract,

and breach of fiduciary duty.  (Id. at 1.)

### STANDARD OF REVIEW

> A moving party without the ultimate burden of
> persuasion at trial . . . has both the initial
> burden of production and the ultimate burden of
> persuasion on a motion for summary judgment.  In
> order to carry its burden of production, the
> moving party must either produce evidence negating
> an essential element of the nonmoving party's
> claim or defense or show that the nonmoving party
> does not have enough evidence of an essential
> element to carry its ultimate burden of persuasion
> at trial. . . . If . . . a moving party carries
> its burden of production, the nonmoving party must
> produce evidence to support its claim or defense.
> . . . [I]f the nonmoving party produces enough
> evidence to create a genuine issue of material
> fact, the nonmoving party defeats the motion.

Nissan Fire & Marine Ins. v. Fritz Co., Inc., 210 F.3d 1099, 1102-03

(9th Cir. 2000) (citations omitted).  A genuine issue of material fact

1  exists when the evidence is such that "a reasonable jury could return
2  a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc.,
3  477 U.S. 242, 248 (1986) (citations omitted).  The non-moving party
4  "is entitled to have the evidence evaluated and reasonable inferences
5  drawn in his favor." Devereaux v. Abbey, 263 F.3d 1070, 1086 (9th
6  Cir. 2001).

7                          DISCUSSION

8       Defendants' evidentiary showing in their motions is
9  sufficient to require Plaintiff to controvert it with facts showing
10  the existence of a genuine issue of material fact.[1] See Devereaux v.
11  Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) ("the Celotex 'showing' can
12  be made by 'pointing out through argument-the absence of evidence to
13  support plaintiff's claim'" (quoting Fairbank v. Wunderman Cato
14  Johnson, 212 F.3d 528, 532 (9th Cir. 2000))).  Accordingly, Plaintiff
15  bears the burden of producing evidence on which the jury could
16  reasonably find in its favor.
17  ///
18  ///
19  ///

20

21       [1]   Plaintiff's "evidentiary objections" to Defendants' separate
22  statements of undisputed facts are not considered because such
    objections should be directed at the evidence supporting those
23  statements.    Plaintiff's evidentiary objections (conclusory,
    argumentative, irrelevant) to statements in the declarations of Fulton,
24  Kimzey, Ellis and Rosales need not be ruled on. See Burch v. Regents of
    the Univ. of Cal., 433 F. Supp. 2d 1110, 1118-1122 (E.D. Cal. 2006)
25  ("Instead of objecting, parties should simply argue that the facts are
    not material.    Similarly, statements in declarations based on
26  speculation or improper legal conclusions, or argumentative statements,
    are not facts and likewise will not be considered on a motion for
27  summary judgment.")  Plaintiff's best evidence rule objections to
    Defendants' declarations are overruled because Defendants' statements
28  regarding the patient lists are not offered to prove their content.

                                  4

I. Plaintiff's Proffered Evidence of Wrongdoing

A. Kimzey and Fulton Acquiring Hanger Information and Using it For Capstone's Benefit

In July 2006, Ellis went to Kimzey's house where he asked him to be a shareholder in the new company. (Schwarcz Decl., Ex. G (Fulton diary entry).)  On August 18, 2006, while still employed at Hanger, Kimzey signed an employment agreement with Ellis to begin work at Capstone in Visalia on an unspecified date.  (Schwarcz Decl., Ex. J.)  Kimzey was communicating with Ellis regarding Capstone later that month.  (Id., Ex. K (fax suggesting office improvements).)  Kimzey testified that after he signed the employment agreement he viewed himself as Capstone's designated agent for the development and growth of the company.  (Kimzey Decl. at 102:17-103:6.)  Kimzey and Fulton's employment at Hanger was terminated on October 6, 2006.  (Kimzey Depo. at 108:1-14; Fulton Dep. at 115:15-116:5.)  Kimzey and Fulton are currently employed by Capstone.  (Fulton Dep. at 32:4-5; Kimzey Dep. at 13:25.)

An Office Administrator at Hanger's Visalia care center, Shawna Rhyne ("Rhyne") declared that in about late September or early October 2006,

> Fulton told me that her brace clinic at Dr. Barnaby's office had been cancelled because Hanger had found out the real reason for the clinic was to solicit business for the new company.  Fulton stated that she suspected Yolanda Mosqueda was a spy for Hanger, and that I should not tell her anything.

(Rhyne Decl. ¶ 4.)  Rhyne also declared that on October 5, 2006, she "saw that Fulton was printing documents from my desktop computer, referred to as the 'client' computer, which I had left unattended while talking with Kimzey.  Fulton told me she was printing off a

'patient recall list' dating back to 2004." (Id. ¶ 6.)  Rhyne
declared that on that day "Kimzey spoke to me about his new business
[and] told me . . . I would receive a raise of a 'buck.'  Kimzey
informed me that Hanger had to be out of their current business
premises by November 1, 2006, and that he was getting the office
space."  Then, "while Fulton and Kimzey continued to print the patient
list[] I asked Fulton if she needed anything from me before I left,
and she responded, 'Not unless you want to be part of a conspiracy
meeting.'" (Id. ¶¶ 5,7.)  Later that evening, Fulton called Rhyne and
asked for her computer password and in the background she heard Kimzey
telling Fulton, "I'm her boss and she has to give it to you." (Id. ¶
8.)  Rhyne then gave Fulton her password. (Id.)  Ms. Rhyne declared
that she never saw the documents again in the office. (Id. ¶ 9.)

Another office administrator for Hanger Visalia declared
that in September 2006, "Kimzey asked me for the names of some of
Hanger's biggest payors (insurance companies) for the Visalia patient
care center.  Kimzey stated that a contracting person was working on
contracts for the new company, and that the list of payor names would
be helpful.  I provided Kimzey with payor names as he had requested."
(Mosqueda Decl. ¶ 7.)  She further declared that in September 2006 she
saw Fulton, with the assistance of Kimzey, connecting a thumb drive
(that was not a type used by Hanger) to a desktop computer referred to
as the "client" computer, and that "Fulton told me she wanted to copy
Hanger forms." (Id. ¶¶ 5, 6.)[2]

---

[2]    Plaintiff proffers additional evidence that Fulton used a
Hanger laptop, which a computer forensic analyst, Mark Alcock
("Alcock"), examined and found evidence of deletion of data and other
damage.  However, Alcock's declarations are not admissible evidence.  In
a prior motion, (Defs.' Mot. to Exclude Expert Witness, Dkt. No. 62),
(continued...)

The practice manager at Hanger's Visalia center, John Wettstein, declared that Kimzey told him that "he believed he was entitled to take Hanger's patient recall list for use in his new business. The patient recall list is a list used to contact patients to inform them about upcoming Hanger product demonstrations and/or clinical check-ups." (Wettstein Decl. ¶ 7.)[3]

There is evidence that Fulton and Kimzey were holding back on contacting patients in the month before they left to work for Hanger. (Wettstein Decl. ¶ 6 ("In or about September 2006, Kimzey told me that he was holding back on business and working referral

---

[2](...continued)
Defendants argued that the proffered testimony is "expert opinion" testimony, as it is not factual nor based on personal observations but rather, is based solely on scientific, technical or other specialized knowledge. (Reply at 5:5-19.) Defendants moved to dismiss the testimony since Plaintiff identified Alcock as a percipient fact witness pursuant to Federal Rule of Civil Procedure 26(a)(1), and did not designate Alcock as an expert or produce a Rule 26(a)(2)(B) expert report. Plaintiff argued that Alcock was not bound by the expert disclosure and reporting requirements of Rule 26(a)(2) because it intended to offer Alcock's testimony based on his personal observations rather than his expert opinion. (Opp'n at 1:1-10.) Thus, Plaintiff cannot present "expert opinions" by Alcock, because, as Plaintiff recognizes, Plaintiff has not identified him as an expert.
    The findings from Alcock's investigation do not constitute lay opinions since Alcock's testimony regarding computer misuse was based upon scientific, technical, or other specialized knowledge. Instead, these findings fall within the scope of Federal Rule of Evidence 702, and are governed by its standards and the corresponding expert disclosure requirements of Federal Rule of Civil Procedure 26. See State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992) (lay "testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field.")

[3]    Defendants evidentiary objection number 15 objects to this statement as hearsay and best evidence. That objection is overruled because how the list is used is not a statement by the list. Objections to Wettstein's declaration regarding what the lists contain is overruled because it is not offered to prove the content of a specific list but as a general description.

sources in anticipation of the new business."); Jensen Decl. ¶ 6 ("The Visalia care facility also experienced a decline in net sales during September 2006, the month prior to Kimzey and Fulton's termination from employment at Hanger."); Stuckwisch Decl., Ex. A (Stuckwisch Expert Report) ¶ 3 ("[T]here seems no other explanation for the drop in sales [at the Visalia facility during September other than the fact that Ellis, Kimzey and Fulton "began scheming to steal business from Hanger in its Visalia marketplace."]  There were not any significant changes in market conditions (other than defendants' alleged actions) or [in prosthetic and orthotic] technology.").)

        Hanger's attorney declared that "[f]our of the five prosthetic patient-customers seen at Capstone-Visalia in 2006 following Kimzey's and Fulton's termination were formerly serviced at Hanger [and] [n]ine orthotic patient-customers seen at Capstone-Visalia in 2006 were formerly serviced at Hanger."  (Schwarcz Decl. ¶¶ 28-29.)[4]  In addition, "Ellis served multiple prosthetic patients who

---

        [4]     Defendants object to paragraphs twenty-six through thirty-three of Schwarcz's declaration.  (Defs.' Evidentiary Objections, nos. 32-39.)  Objection number 32 (false statement) is overruled.  This bare assertion, without more, is not sufficient to counter Mr. Schwarcz's sworn declaration.  No. 33 (best evidence rule) is sustained.  Mr. Schwarcz's declaration that the files contain identical information is proffered to prove the content of a writing — Hanger's patient files.  Fed. R. Evid. 1002.  Nos. 34, 35 (personal knowledge) are overruled.  Mr. Schwarcz's declaration that he inspected Capstone patient files and that he is familiar with the file and documents related to this action is sufficient to support a finding that he has personal knowledge of these files.  No. 36 (personal knowledge, hearsay, best evidence rule) is overruled.  The names on the patient files are not "assertions" and therefore not hearsay.  See United States v. Snow, 517 F.2d 441, 443-44 (9th Cir. 1975) (name tape attached to a briefcase not an "assertion").  The original Capstone patient files are under the control of Capstone and Mr. Schwarcz's inspection of them put Capstone on notice that the contents would be a subject of proof.  Accordingly,  the originals are not required.  Fed. R. Evid. 1004(3) (original in possession of opponent).  No. 37 (personal knowledge,
                                                              (continued...)

were formerly Hanger patients at Capstone's Visalia location in late 2006." (Id. ¶ 33.)

B. Evidence of Rosales Acquiring and Using Confidential Hanger Information

Rosales entered into an employment agreement with Capstone on September 21, 2006. (Schwarcz Decl., Ex. P (Rosales/Capstone employment agreement).) Rosales continued to work at Hanger until November 17, 2006. (Schwarcz Decl., Ex. Q (Rosales Hanger resignation email).) Rosales is currently employed at Capstone Tracy. (Rosales Dep. at 11:25-12:5.)

Rosales worked at Hanger Tracy with Julia Sanchez, an office administrator, who resigned from Hanger on October 11, 2006, and who subsequently began working at Capstone's Tracy center. (Rosales Dep. at 34:17-22, 91:18-25, 95:1-2; Alltucker Decl. ¶ 3.) Sometime between October 11 and October 19, 2006, someone logged into the Hanger computer network remotely, using Ms. Sanchez's password, and deleted several emails. (Alltucker Decl. ¶¶ 4-7.)[5]

---

[4](...continued)
hearsay, best evidence rule) is sustained. Dates when patients were seen at Capstone are statements offered to prove the truth of the matter asserted and are therefore inadmissible hearsay. No. 38 (personal knowledge, best evidence rule) is overruled. The original Capstone patient files are in the possession of Capstone. No. 39 (lack of personal knowledge) is overruled.

[5] Defendants' evidentiary objections numbers 11 and 17 (lack of personal knowledge) to Ms. Alltucker's statement that no other current Hanger employee utilized this password is overruled since Ms. Alltucker's knowledge of who has access to what passwords can be inferred from her position as Area Administrative Manager and her testimony can be reworded in a form that would be admissible at trial. See Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) ("[Witness's] personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters"). Defendants' evidentiary objection
(continued...)

1    A co-worker of Rosales declared that in late October and

2 November, "Rosales was uncooperative [with other personnel at the

3 Hanger Tracy center,] often did not submit any paperwork for his off-

4 site clinics and interactions with patients [and] was frequently out

5 of the office . . . and called in sick several times . . . ." (Waller

6 Decl. ¶ 3.)[6]  "The Tracy patient care facility experienced a sharp

7 drop in net sales during October 2006, the month prior to Rosales'

8 resignation from Hanger." (Jensen Decl. ¶ 4.)  Plaintiff's financial

9 expert opined that "there seems no other explanation for the drop in

10 sales [at the Tracy facility during October 2006 other than the fact

11 that Ellis and Rosales "began scheming to steal business from Hanger

12 in its Tracy marketplace."]  There were not any significant changes in

13 market conditions (other than defendants' alleged actions) or [in

14 prosthetic and orthotic] technology." (Stuckwisch Decl., Ex. A

15 (Stuckwisch Expert Report) ¶ 3.)

16    Another co-worker of Rosales declared that

17    [s]hortly before Rosales' departure from Hanger in
   November 2006, I evaluated and casted a pediatric
18    patient named Jacob Goatcher for an 'Ankle Foot
   Orthosis,' frequently referred to in the industry
19    as an 'AFO.'  Later that day, Rosales took the
   patient chart for Jacob Goatcher and telephoned
20    his mother.  I heard Rosales leave a message
   stating that Jacob Goatcher's mother should call
21    him back at his personal phone number.  Rosales
   then proceeded to inform me that I did not know
22    how to properly make AFOs.

23    (Crowley Decl. ¶¶ 5-6.)

24

25

26    [5](...continued)
   number 10 (lack of relevance) is overruled.  <u>See</u> <u>Burch v. Regents of the</u>
27 <u>Univ. of Cal.</u>, 433 F. Supp. 2d 1110, 1118-1122 (E.D. Cal. 2006)

28    [6]    Defendants' evidentiary objection number 16 (lack of relevance
   and unfair prejudice) is overruled.

1   "[Sixty-five] patient customers that were formerly seen at

2   Hanger's Tracy Patient Care Center are now Capstone Tracy patients.

3   [And] sixteen orthotic patient customers formerly seen at Hanger were

4   seen at Capstone Tracy in 2006." (Schwarcz Decl. ¶¶ 30, 32.)

5   C. Solicitation of Hanger Employees and Other Conduct by Ellis

6   Ellis's last day of work at Hanger was July 14, 2006, and

7   the Capstone website was activated that weekend. (Ellis Dep. at

8   125:12-17.) Capstone was officially formed on July 21, 2006 (Schwarcz

9   Decl., Ex. S. (Capstone Articles of Inc.).) On July 18, 2006, Kimzey

10  emailed Capstone inquiring about a job. (Schwarcz Decl., Ex. I

11  (Kimzey email).) Kimzey testified that he heard of Capstone from a

12  web page and an advertisement in the magazine O&P Business News.

13  (Kimzey Decl. at 83:1-10.)[7] However, no advertisement for Capstone

14  was run until August 15, 2006. (DelValle Decl., ¶¶ 8-9, Ex. D-E (July

15  and Aug. issues of O&P Bus. News).)

16  A former Hanger employee who had previously reported to Ellis,

17  Craig Cramer, declared

18      While my wife and I were still employed with
        Hanger, and after Mr. Ellis had resigned from
19      Hanger, Mr. Ellis visited our home in Fresno,
        California on several occasions to talk about his
20      new company, Capstone. Mr. Ellis discussed having
        my wife and I come to work for Capstone in Fresno,
21      California. . . . Mr. Ellis instructed my wife
        and I to go to Capstone's internet website and
22      submit emails to Capstone relating to job
        inquires. Mr. Ellis explained that this was
23      necessary so that it legally showed that my wife
        and I had approached Capstone for the jobs
24      unsolicited. . . . Mr. Ellis also stated that he
        would pay my wife and I one week's salary without
25      us having to come into Capstone's Fresno,

26  ────────────────

27      [7]   Plaintiff argues that Kimzey emailed Capstone because he saw
    an advertisement in O&P Business News, however the deposition pages to
28  which Plaintiff refers are not included in the record. (Opp'n at 6:5-6
    (citing  Kimzey Dep. at 173:12-23).)

1   California office, in order to make the timing of
    our arrival appear less suspicious.  Mr. Ellis was
2   aware that I had the biggest referral accounts at
    Hanger for its Fresno, California patient care
3   center.  Mr. Ellis wanted me to bring those
    referral sources to Capstone. . . . Mr. Ellis also
4   specifically requested I recruit other Hanger
    employees to work for Capstone.

5

6   (C. Cramer Decl. ¶¶ 1-8.)[8]

7   D. Damage to Hanger

8           Plaintiff's financial expert opines that "Hanger has 1)

9   suffered lost profits ranging from $154,077 to at least $238,244

10  through July 2007 . . . 2) incurred out-of-pocket expenses which I

11  estimate to be at least $59,136, and 3) suffered future economic

12  losses from lost prosthetics patients which I estimate to be $380,337

13  for five prosthetics patients." (Stuckwish Decl., Ex. A (Expert Report

14  of Suzanne Stuckwisch) ¶ 3.)

15  II.  Defendants' Evidence

16          Defendants have submitted declarations from Ellis, Fulton,

17  Kimzey and Rosales in which they deny all allegations.  Defendants

18  also submitted portions of the deposition of Lars Jensen, a Hanger

19

20          [8]   Plaintiff's evidentiary objections numbers 27-29 (relevance,
21  vague and ambiguous) are overruled.  Mr. Cramer's statements are
    relevant and are not ambiguous as to time.  Objection number 30 is not
22  considered because that evidence is not considered.  Objection number 31
    (lack of personal knowledge, speculation, assumes facts not in evidence)
23  to Cramer's statement that Ellis was aware of his referral accounts and
    wanted to bring them to Capstone is overruled.  Mr. Cramer's position at
24  Hanger demonstrates that he has personal knowledge of the referral
    accounts, how big they are, and who has seen them, and he is not
25  speculating if Mr. Ellis told him to bring those sources to Capstone.
    See Burch, 433 F. Supp. 2d at 1120 ("when evidence is not presented in
26  an admissible form in the context of a motion for summary judgment, *but
    it may be presented in an admissible form at trial*, a court may still
27  consider that evidence.")  Defendants also object to the declaration of
    Ms. Cramer.  However, because her testimony is duplicative of Mr.
28  Cramer's it is not considered.

employee designated by Hanger as the person most knowledgeable to testify regarding Hanger's trade secrets, in which he admits Plaintiff's lack of direct evidence of trade secret misappropriation. (Kachmar Decl., Ex. A (Jensen Decl.).)  Defendants also proffer declarations by three former Hanger patients now at Capstone (two former Rosales patients now served at Capstone Tracy and one former Kimzey patient now served at Capstone Visalia) in which they declare they went to Capstone on their own without solicitation from Capstone. (See Kachmar Decl. in Support of Reply, Ex. C.)  Defendants further proffer declarations by Ellis (who denied recruiting Mr. Cramer) and other former Hanger employees to the effect that the "Cramers are former disgruntled Hanger employees who provided services to Capstone, and after Capstone refused to give in to Mr. Cramer's threats for more money, left to return to Hanger" and threatened to "bankrupt" Capstone.  (Reply at 3:4-14 (citing Decls. in support of Reply; Ellis Decl., Schott Decl., Perez Decl.).)

III.  Computer Fraud and Abuse Under California and Federal Law

Plaintiff's first cause of action is for Computer Fraud and Abuse under 18 U.S.C. § 1030 ("§ 1030").  (Compl. at 1.)  18 U.S.C. § 1030(a)(4) establishes civil liability for whomever: "knowingly and with intent to defraud, accesses a protected computer without authorization or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . ."  18 U.S.C. § 1030(5) establishes civil liability for whomever: "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and (B) by [that] conduct . . . caused . . . loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value . . . ."

The term "defraud" for purposes of § 1030(a)(4) simply means wrongdoing and does not require proof of common law fraud.  See Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000).  "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data . . . ."  18 U.S.C. § 1030(e)(11).  Employees that access their employer's computers to obtain or delete business information for their own personal benefit or the benefit of a competitor act "without authorization" or "exceed authorization" within the meaning of the statute.  See, e.g., Int'l Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418, 42-21 (7th Cir. 2006) (finding employee acted without authorization because the employee's "breach of his duty of loyalty [in deleting computer files] terminated his agency relationship . . . and with it his authority to access the laptop . . . .").  Both former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system face liability under § 1030.  See Pac. Aerospace & Elecs., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1196 (E.D. Wash. 2003).

        Plaintiff's second cause of action is for Computer Abuse under California Penal Code section 502 ("§ 502"), which has similar elements to § 1030.  Plaintiff and Defendants incorporate by reference their arguments regarding § 502 into the arguments regarding § 1030. (Opp'n at 21:28-22:5; Reply at 5:21-22.)  Likewise, these claims are considered together here.

14

A. Fulton and Kimzey

Defendants argue "[t]here is no evidence that Kimzey or Fulton ever accessed a Hanger computer without authorization and with the intent to defraud Hanger and obtain anything of value [and] there is no admissible evidence that Kimzey or Fulton ever accessed a Hanger computer without authorization and caused any damage."[1] (Kimzey/Fulton Mot. at 7:1-4.)  Defendants further argue that under § 1030 there must be evidence as to what specific computer information was actually viewed, let alone taken. (Fulton/Kimzey Mot. at 6:20-23 (citing P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, L.L.C., 428 F.3d 504 (3rd Cir. 2005)).)  However, there is evidence of what was taken because Rhyne declared that Fulton told her she she was printing off a 'patient recall list' dating back to 2004.  (Rhyne Decl. ¶ 6.)

Fulton and Kimzey also argue that expert opinion testimony is required "to establish that there has been an unauthorized access or any damage to plaintiff's computers." (Kimzey/Fulton Mot. at 6:23-27 (citing Expert Bus. Sys., L.L.C. v. BI4CE, Inc., 411 F. Supp. 2d 601, 605 (D. Md. 2006)).)  However, Expert Bus. Sys. simply held that a jury could not reasonably find for plaintiff on a complex computer hacking theory when the defendant's expert testified that no such hijacking had occurred and plaintiff produced no rebuttal evidence. Id. at 605-06.

A jury could reasonably find that Fulton and Kimzey accessed a Hanger computer.  The Office Administrator at Hanger's Visalia care center declares that on October 5, 2006, she "saw that Fulton was

---

[1]     Defendants do not dispute that Hanger computers are "protected computers."  (Kimzey/Fulton Mot. at 7:1-4.)

printing documents from my desktop computer, referred to as the 'client' computer, which I had left unattended while talking with Kimzey.  Fulton told me she was printing off a 'patient recall list' dating back to 2004."  (Rhyne Decl. ¶ 6.)  A jury could infer that Kimzey accessed the Hanger computer when later that evening Fulton called Rhyne and asked for her computer password and in the background she heard Kimzey telling Fulton, "I'm her boss and she has to give it to you."  (Id. ¶ 8.)  A jury could reasonably infer that the patient recall list is something of value as discussed *infra* with regards to Plaintiff's trade secret misappropriation claim.

A jury could reasonably infer that Kimzey and Fulton's access of the computer was done with the intent to defraud (and therefore exceeding their authority) since Rhyne declares that on that day "Kimzey spoke to me about his new business" and "while Fulton and Kimzey continued to print the patient list[] I asked Fulton if she needed anything from me before I left, and she responded, 'Not unless you want to be part of a conspiracy meeting.'" (Rhyne Decl. ¶¶ 5,7.) In addition, Kimzey told Wittstein that Kimzey believed it was appropriate to take a patient list for his new business.  (Wettstein Decl. ¶ 7.)  A jury could reasonably infer that this list was used to solicit Hanger patients for Capstone (furthering the fraud) since  Ms. Rhyne declared that she never saw the documents again in the office and "[f]our of the five prosthetic patient-customers seen at Capstone-Visalia in 2006 following Kimzey's and Fulton's termination were formerly serviced at Hanger [and] [n]ine orthotic patient-customers seen at Capstone-Visalia in 2006 were formerly serviced at Hanger." (Rhyne Decl. ¶ 9; Schwarcz Decl. ¶¶ 28-29.)  In addition, the evidence that sales dropped at the Hanger office prior to Fulton's and Kimzey's

departure supports drawing an inference that they were not using the patient recall list while at Hanger in anticipation of using it once they began working for Capstone.  Accordingly, a genuine issue of material fact exists whether Fulton and Kimzey violated § 1030(a)(4).

With regards to § 1030(5), a jury could reasonably find that taking the lists caused "loss" because Plaintiff's expert report demonstrates that Plaintiff has suffered lost profits. (Stuckwish Decl. ¶ 3, Ex. A.)  However, the only evidence proffered by Plaintiff of any action that caused computer damage (impairment to the integrity of availability of data and systems), is the declaration of Mark Alcock regarding mass deletions and other alterations.  (Opp'n at 16:22 (citing Alcock Decl. ¶¶ 14, 16).)  Since this evidence is inadmissible, summary adjudication of § 1030(5) is granted in favor of all Defendants.

For the reasons stated above, a genuine issue of material fact exists whether Kimzey and Fulton violated § 502, except for § 502(c)(3) which also requires damage to the computer.  Accordingly, summary adjudication is granted on Plaintiff's § 502(c)(3) for all Defendants.

B. Rosales

Defendants argue "there is no admissible evidence that Rosales ever directed anyone to access a Hanger computer network with a username/password assigned to Julia Sanchez."  (Rosales Mot. at 2:21-23 (citing Rosales Decl. ¶ 6 (denying); Kachmar Decl. ¶ 5 (plaintiff has not identified the person Rosales directed to access computer).)  Plaintiff rejoins that sufficient evidence exists for its § 1030 claim against Rosales:

> Kelly Alltucker observed that Julia Sanchez's
> password was being used to access Hanger's

> computer system for nearly one week after
> Sanchez's resignation from Hanger in October 2006.
> At this time, Rosales had already signed his
> employment agreement with Capstone.  Sanchez, who
> had worked with Rosales for several years,
> solicited a job opportunity from, and began
> working for Capstone.  Sanchez and Rosales then
> later ended up working together again at
> Capstone's Tracy location. [The] Tracy patient
> care center[] experienced significant declines in
> monthly sales shortly before . . . Rosales left
> Plaintiff's employment.  Capstone's patient
> records also demonstrate that numerous prosthetic
> and orthotic patients formerly seen at Hanger in
> Tracy and Visalia are now Capstone customers, and
> that Ellis, Kimzey, and Rosales began seeing such
> patients shortly after leaving Hanger.

(Opp'n at 17:5-19 (citations omitted).)

While a jury could reasonably infer from the evidence that Rosales used some Hanger patient information to solicit patients for Capstone (as discussed *infra*) there is insufficient evidence from which to reasonably infer that Rosales acquired a patient list by accessing Hanger's computers using Ms. Sanchez's password (or by directing her to do so).  Plaintiff's other evidence shows that Rosales used a hard copy patient file to contact a patient.  There is no evidence that anything of value was taken when Hanger's computer was accessed with Ms. Sanchez's password.  See P.C. Yonkers, Inc., 428 F.3d at 508, 509 (granting summary judgment on § 1030 claim because "there is absolutely no evidence as to what, if any, information was actually viewed, let alone taken. . . . That information was taken does not flow logically from mere access.")  Accordingly, summary adjudication of the § 1030 and § 502 claim against Rosales is granted.

///

///

///

///

C.  Ellis and Capstone

Defendants argue "[t]here is not a single allegation in the Complaint, nor has any admissible evidence been produced, that an employee of Capstone wrongfully accessed any Hanger computer." (Capstone Mot. at 3:8-9 (citing Kachmar Decl. ¶ 6, Ellis Decl. ¶ 12 (establishing that Kimzey, Fulton, and Rosales became employed by Capstone after their alleged wrongful conduct).)  Plaintiff rejoins

> Kimzey, Fulton and Rosales were in fact acting as agents of Capstone while remaining employed with Hanger.  Ellis, on behalf of Capstone, executed employment agreements with both Kimzey and Rosales *months* before they finally resigned and/or were terminated.  Kimzey testified that he considered himself the 'agent' of Capstone after he signed the employment agreement on August 18, 2006.  A trier of fact could draw legitimate inferences based on the evidence that the unlawful, unauthorized computer access by Kimzey, Fulton and Rosales was done for the benefit, and with the knowledge and/or consent of Capstone.
>                          * * *
> Similarly, Ellis can be found liable under [§ 1030] for the wrongful actions of Kimzey, Fulton and Rosales.  Ellis is the Chief Executive Officer and one of three directors of Capstone.  Ellis testified that he is also a 1/3 owner of Capstone, and that his responsibilities includ[e] 'everything' except administrative and finance functions.  The evidence shows that Ellis was the point-person for recruiting, negotiating and interacting with potential Capstone employees, including Kimzey and Rosales, even before Capstone's official formation.  There is also evidence that Ellis proactively recruited Hanger employees, created sham evidence of non-solicitation, and asked them to recruit other Hanger employees on Capstone's behalf.

(Opp'n at 19:7-19 (citations omitted).)  Defendants rejoin that "there is no admissible evidence that Capstone knew of or consented to the alleged improper access of Hanger's computers."  (Reply at 8:26-27.)

Capstone and Ellis can be held liable for the unlawful acts of their employees if it can be shown that Ellis authorized, directed,

or participated in the unlawful acts.  See Bancroft-Whitney Co. v. Glen, 64 Cal. 2d 327, 353 (1966) (finding that where evidence indicated that Company's president was aware of or ratified breach of fiduciary duty by employee of competitor company, and company received benefits of breach, liability would attach to Company and personal liability would attach to its president); PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1379 (2000) ("[A]n individual officer or director will be [liable for the corporation's torts when] he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct.").

Considering Plaintiff's evidence in the light most favorable to Plaintiff reveals, in July 2006, Ellis asked Kimzey to be a shareholder in the new company. (Schwarcz Decl., Ex. G.)  Ellis signed an employment agreement with Kimzey in August of that year and Kimzey was communicating with Ellis regarding Capstone later that month. (Id., Ex. K (fax regarding suggested office modifications).)  Kimzey testified that after he signed the employment agreement he viewed himself as Capstone's designated agent for the development and growth of the company.  (Kramer Decl. at 102:17-103:6.)  Mr. Ellis was aware that some of his tactics to start Capstone were illegal and was willing to employ them nonetheless.  (C. Cramer Decl. ¶ 4 ("Mr. Ellis instructed my wife and I to go to Capstone's internet website and submit emails to Capstone relating to job inquires.  Mr. Ellis explained that this was necessary so that it legally showed that my wife and I had approached Capstone for the jobs unsolicited.").)  Ellis also asked another Hanger employee to bring Hanger referral accounts to Capstone.  (Id. ¶ 7 ("Mr. Ellis wanted me to bring those referral sources [from Hanger] to Capstone.").)  From this evidence a

1   reasonable jury could infer that Kimzey was Capstone's agent and that

2   Ellis authorized Kimzey's access of Hanger's computer to obtain

3   patient lists for the benefit of Capstone.

4   IV.   Trade Secret Misappropriation

5          Defendants seek summary judgment on Plaintiff's third claim,

6   Trade Secret Misappropriation under the Uniform Trade Secret Act

7   ("UTSA"), California Civil Code section 3426.  Under the UTSA, a trade

8   secret is defined as

9              information, including a formula, pattern,
               compilation, program, device, method, technique,
10             or process, that: (1) Derives independent economic
               value, actual or potential, from not being
11             generally known to the public or to other persons
               who can obtain economic value from its disclosure
12             or use; and (2) Is the subject of efforts that are
               reasonable under the circumstances to maintain its
13             secrecy.

14   Cal. Civ. Code § 3426.1(d).  "[W]here the employer has expended time

15   and effort identifying customers with particular needs or

16   characteristics," such information is a trade secret.  Morlife, Inc.,

17   v. Perry, 56 Cal. App. 4th 1514, 1521 (1997).

18          Defendants argue that "Mr. Jensen admitted that Hanger's

19   'referral source' information is listed in public documents, such as

20   yellow pages, the internet, physician guides, etc. and thus, are not

21   even secret." (Kimzey/Fulton Mot. at 4:15-17 (citing Jensen Dep. at

22   202:3-8).)  Plaintiff counters that its "confidential business

23   information, including its patient-customer data, is procured by

24   substantial time, effort and expense and is the subject of reasonable

25   anti-disclosure measures."  (Opp'n at 22:14-22.)  However, referral

26   sources are only a part of the information contained in Hanger's

27   confidential Orthotics Prosthetics System and patient files.

28

1          Plaintiff has proffered sufficient evidence for a jury to
2     reasonably find that Hanger's patient customer data are protected
3     trade secrets.  Ms. Alltucker declared that patient files include
4     prescriptions/referral source information, treatment records,
5     addresses, etc. and the electronic Orthotics Prosthetics System (OPS)
6     contains patient information, and referral source information.
7     (Alltucker Decl. ¶¶ 9, 11, 12.)  Alltucker further declared that
8     Hanger expended significant resources developing these and other
9     Hanger business forms and the information is protected through having
10    employees sign Employment Confidentiality/ Training Attestations and
11    limiting access to electronic information.  (Id. ¶¶ 9-12.)  In
12    addition, Hanger's patient files have economic value because their
13    "disclosure would allow a competitor to direct its sales efforts to
14    those customers who have already shown a willingness to use a unique
15    type of service or product as opposed to a list of people who only
16    might be interested" and Hanger took reasonable steps to protect this
17    information.  Morlife, Inc., 56 Cal. App. 4th at 1522.

18         "A violation of the UTSA occurs when an individual
19    misappropriates a former employer's protected trade secret client
20    list, for example, by using the list to solicit clients or to
21    otherwise attain an unfair competitive advantage."  Reeves v. Hanlon,
22    33 Cal. 4th 1140, 1155 (2004).

23              [M]isappropriation and misuse can rarely be proved
               by convincing direct evidence.  In most cases
24             plaintiffs must construct a web of perhaps
               ambiguous circumstantial evidence from which the
25             trier of fact may draw inferences . . . that it is
               more probable than not that what plaintiffs allege
26             happened did in fact take place.

27

28

1 UnriRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co., 2007 WL 2572225,

2 at *5 (N.D. Cal. Sept. 5, 2007) (quoting Q-Co Indus., Inc. v. Hoffman,

3 625 F. Supp. 608, 618 (S.D.N.Y. 1985)).

4 A. Kimzey and Fulton

5    As discussed above, a jury could reasonably find that Kimzey

6 and Fulton acquired a Hanger patient recall list and used it to

7 solicit clients for Capstone.

8 B.  Rosales

9    A jury could reasonably infer from Plaintiff's evidence that

10 Rosales used Hanger's patient information to solicit patients for

11 Capstone.  (Jensen Decl. ¶ 4 ("The Tracy patient care facility

12 experienced a sharp drop in net sales during October 2006, the month

13 prior to Rosales' resignation from Hanger."); Stuckwisch Decl., Ex. A

14 (Stuckwisch Expert Report) ¶ 3 ("[T]here seems no other explanation

15 for the drop in sales [at the Tracy facility during October 2006 other

16 than the fact that Ellis and Rosales "began scheming to steal business

17 from Hanger in its Tracy marketplace."].  There were not any

18 significant changes in market conditions (other than defendants'

19 alleged actions) or technology."); Schwarcz Decl. ¶ 30 ("65 patient-

20 customers that were formerly seen at Hanger's Tracy patient care

21 center are now Capstone-Tracy patients"); Crowley Decl. ¶¶ 5-6

22 ("Shortly before Rosales' departure from Hanger in November 2006,

23 Rosales took the patient chart for Jacob Goatcher and telephoned his

24 mother.  I heard Rosales leave a message stating that Jacob Goatcher's

25 mother should call him back at his personal phone number.").)

26 C. Capstone and Ellis

27    Plaintiff argues that "a trier of fact could draw legitimate

28 inferences based on the evidence that Capstone and Ellis used the

trade secrets that were wrongfully acquired by Kimzey, Fulton, and Rosales." (Opp'n at 25:7-19 (citing Cadence Design Sys., Inc. v. Avant! Corp., 29 Cal. 4th 215, 222 (2002) ("A *misappropriation* within the meaning of the UTSA occurs not only at the time of the initial acquisition of the trade secret by wrongful means, but also with each misuse or wrongful disclosure of the secret.")).)  Plaintiff argues that Ellis and Capstone "used" Hanger's trade secrets by soliciting customers with the trade secret information.  (Opp'n at 25:15-18 (citing PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1383 (2000)).) Plaintiff further argues that evidence that Kimzey and Fulton acquired Hanger's patient list "predicates agency and/or co-conspirator liability on Ellis and Capstone . . . ."  (Opp'n at 26:16-17.) Defendants rejoin that "Ellis['s] only alleged wrongdoing is that he saw patients who were formerly seen at Hanger.  However, there is no evidence that Ellis took or used any trade secrets of plaintiff in seeing these patients who visited Capstone . . . ."  (Reply at 9:6-9, 10:16-17.)

> Under California Civil Code § 3426, indirect trade secret misappropriation requires proof that: (1) Plaintiff is the owner of a valid trade secret; (2) Defendant acquired the trade secret from someone other than Plaintiff and: (a) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret without Plaintiff's authorization; (4) Plaintiff suffered harm as a direct and proximate result of Defendant's use or disclosure of the trade secret, or Defendant benefitted from such use or disclosure.

Steinbert Moorad & Dunn, Inc. v. Dunn, 2002 WL 31968234, at *23-24 (C.D. Cal. Dec. 26, 2002).

1    A genuine issue of material fact exists as to whether
2 Capstone employees used Hanger patient files to solicit patients in
3 light of the numerous former Hanger patients being served by
4 Capstone's Tracy patient care center.  (Schwarcz Decl. ¶ 30 (65 former
5 Hanger patients now at Capstone Tracy).)  Moreover, as discussed
6 *supra*, a jury could reasonably infer that Kimzey was acting as
7 Capstone's agent when he acquired Hanger's patient files, and that
8 Ellis knew of and ratified Kimzey's acquisition and use of patient
9 lists.

10 <u>V. Conversion</u>

11    Defendants seek summary judgment of Plaintiff's fourth claim
12 of conversion.  Under California law, a claim of conversion requires
13 "plaintiff's ownership or right to possession of property; defendant's
14 wrongful act toward or disposition of the property, interfering with
15 plaintiff's possession; and damage to plaintiff." <u>McKell v. Wash.</u>
16 <u>Mut., Inc.</u>, 142 Cal. App. 4th 1457, 1491 (2006).  The
17 "misappropriation and sale of . . . intangible property of another
18 without authority from the owner is conversion." <u>A & M Records, Inc.</u>
19 <u>v. Heilman</u>, 75 Cal. App. 3d 554, 570 (1977) (holding sale of copies of
20 musical recordings, the master recordings of which are owned by
21 plaintiff, is conversion).

22    Plaintiff's patient lists and business forms are "property"
23 and use of those lists and forms for the benefit of Capstone would be
24 conversion.  (Fulton/Kimzey Mot. at 8:13-25; Reply at 10:19-11:10.)
25 Defendants argue, however, that Plaintiff's conversion claim "fails
26 for the same reason as its trade secret misappropriation claim —
27 [t]here is no admissible evidence that [Defendants] converted any of
28 Plaintiff's trade secrets/ confidential information."  (Rosales Mot.

at 8:4-6; Kimzey/Fulton Mot. at 8:21-23; Ellis Mot. at 8:3-6.)
Plaintiff rejoins that "there are genuine issues of material fact as
to whether Kimzey, Fulton and Rosales acquired Plaintiff's
confidential information in the form of a patient list or business
form, and whether all Defendants used and/or benefit[t]ed from the
conversion of said confidential information."  (Opp'n at 27:5-11
(citing Mosqueda Decl. ¶¶ 4-7, 11; Rhyne Decl. ¶¶ 6-9; Wettstein
Decl., Schwarcz Decl. ¶¶ 28-33.)

        Since facts supporting Plaintiff's misappropriation of trade
secrets claim also support its claim of conversion, a jury could
reasonably find in favor of Plaintiff on this claim.

VI. Interference with Prospective Economic Advantage

        Defendants seek summary judgment on Plaintiff's claim that
Defendants interfered with Plaintiff's prospective economic advantage
by "misappropriating and exploiting Hanger's valuable Confidential
Information; using the Confidential Information to solicit Hanger's
patients and referral sources; and using the Confidential Information
to solicit Hanger's employees."  (Compl. ¶ 89.)

        The elements of the tort of intentional interference with
prospective economic advantage are:

                (1) an economic relationship between the plaintiff
                and some third party, with the probability of
                future economic benefit to the plaintiff; (2) the
                defendant's knowledge of the relationship; (3)
                intentional acts on the part of the defendant
                designed to disrupt the relationship; (4) actual
                disruption of the relationship; and (5) economic
                harm to the plaintiff proximately caused by the
                acts of the defendant.

Youst v. Longo, 43 Cal. 3d 64, 71 (1987).  The intentional act on the
part of the defendant must be an independently wrongful and unlawful
act.  Reeves v. Hanlon, 33 Cal. 4th 1140, 1152 (2004) (stating a

wrongful act is an act "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard") (citation omitted).

Defendants argue "[t]here is no admissible evidence that [they] ever obtained plaintiff's confidential information or ever used it to solicit plaintiff's patients or employees." (Kimzey/Fulton Mot. at 9:16-19; Rosales Mot. at 8:23-25; Capstone Mot. at 10:12-14; Ellis Mot. at 4:21-22.) Capstone and Ellis further argue that they did not solicit Kimzey, Fulton or Rosales and each of these individuals contacted Capstone seeking employment.[2] (Ellis Mot. at 8:24-26; Capstone Mot. at 14-17.) Plaintiff rejoins that "there is substantial direct and circumstantial evidence that Defendants obtained Plaintiff's confidential information. Further, there is admissible evidence to support a legitimate inference that Defendants used such confidential information to solicit Hanger's patients and disrupt those relationships." (Opp'n at 29:5-11.)

Since facts supporting Plaintiff's misappropriation of trade secrets claim against Kimzey, Fulton and Rosales also support this claim, a jury could reasonably find in favor of Plaintiff on this claim. In addition, as discussed *infra*, since a jury could reasonably find that Ellis, Capstone and Kimzey formed a conspiracy to misappropriate Hanger patient files, Ellis and Capstone could also reasonably be held liable for interference with prospective economic advantage.

///

---

[2] Because Defendants only challenge the third and fourth elements of the claim (whether confidential information was misappropriated and used to solicit patients and employees), the other elements are not considered.

## VII. Unfair Competition

Defendants seek summary judgment on Plaintiff's claim that Defendants violated the California Unfair Competition law (Cal. Bus. & Prof. Code §§ 17200, et seq.) by breaching fiduciary or contractual duties and using Hanger's confidential information to solicit Hanger employees, patients and referral sources for the purpose of gaining an unfair competitive advantage over Hanger. (Compl. ¶¶ 94-97.)  Section 17200 creates liability for unlawful, unfair or fraudulent business practices.  Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180 (1990).

Defendants argue "there is no admissible evidence that [Kimzey, Fulton or Rosales] converted or utilized any of plaintiff's trade secret/confidential information to 'wrongfully' solicit plaintiff's employees, patients or referral sources." (Kimzey/Fulton Mot. at 10:9-11; Rosales Mot. at 9:15-18.)  Ellis, Rosales and Capstone further argue that even if they solicited Hanger employees, such solicitation of at-will employees does not give rise to liability. (See Capstone Mot. at 11:10-22 (citing Reeves v. Hanlon, 33 Cal. 4th 1140, 1151 (2004) ("Where no unlawful methods are used, public policy generally supports a competitor's right to offer more pay or better terms to another's employee, so long as the employee is free to leave.")).)  Plaintiff rejoins that evidence supporting other alleged unlawful acts also support section 17200 liability. (Opp'n at 30:25-31:1.)  Plaintiff further argues that sufficient evidence exists to find that Kimzey, Fulton and Rosales obtained Plaintiff's confidential information and "used such confidential information to gain an improper advantage with Plaintiff's patient-customers" constituting unfair competition. (Opp'n at 31:5-7.)

1    Since a jury could reasonably find that Defendants
2    misappropriated Hanger's trade secrets, such a finding could support
3    "unlawful" business practices liability under section 17200.
4    VIII. Civil Conspiracy
5    Defendants challenge Plaintiff's civil conspiracy claim
6    arguing civil conspiracy is not itself a cause of action and therefore
7    fails as a matter of law.  (Fulton/Kimzey Mot. at 10:13-22.)
8    Plaintiff rejoins "Defendants are correct that civil conspiracy is not
9    a cause of action, but a legal doctrine that imposes liability on
10   persons who, although not actually committing a tort themselves, share
11   with the immediate tortfeasors a common plan or design in its
12   preparation. But the civil conspiracy doctrine permits tort recovery
13   against all co-conspirators for wrongful conduct, and here Plaintiff
14   has alleged multiple torts."  (Opp'n at 33:11-20 (citations omitted).)

15   "Pleadings must be construed so as to do justice."  Fed. R.
16   Civ. P. 8(e).  While Plaintiff's seventh claim is simply titled "civil
17   conspiracy," the allegations contained therein state "Defendants
18   formed a conspiracy for the purpose of unlawfully advancing
19   Defendants' economic interests, including misappropriating Hanger's
20   Confidential Information, breaching fiduciary duties owed to Hanger,
21   converting Hanger property and doing the things alleged herein, all to
22   the detriment of Hanger's economic interests."  (Compl. ¶ 105.)
23   Defendants have not shown these civil conspiracy allegations fail as a
24   matter of law.

25   "[T]he basis of a civil conspiracy is the
     formation of a group of two or more persons who
26   have agreed to a common plan or design to commit a
     tortious act."  The conspiring defendants must
27   also have actual knowledge that a tort is planned
     and concur in the tortious scheme with knowledge
28   of its unlawful purpose. . . . Knowledge of the
     planned tort must be combined with intent to aid

in its commission. . . . While knowledge and
intent "may be inferred from the nature of the
acts done, the relation of the parties, the
interest of the alleged conspirators, and other
circumstances" "[c]onspiracies cannot be
established by suspicions. . . . There must be
evidence of some participation or interest in the
commission of the offense."

Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 1582 (1995)
(quoting first 1 Levy et al., Cal. Torts (1995) Civil Conspiracy, §
9.03[2], p. 9-12; (quoting second Wyatt v. Union Mortgage Co., 24 Cal.
3d 773, 785 (1979); quoting third Davis v. Superior Court, 175 Cal.
App. 2d 8, 23 (1959)).

A. Capstone

        Capstone argues that it "cannot be liable for allegedly
conspiring to participate in other people's alleged breaches of
fiduciary duty or contract where this Court has already found as a
matter of law that Capstone did not owe plaintiff any fiduciary or
contractual duties." (Capstone Mot. at 13:1-4 (citing Order, Dkt. No.
39 (granting summary judgment on Plaintiff's claims against Capstone
for breach of contract and breach of fiduciary duty).)  Plaintiff does
not address this argument. (See Opp'n at 32:1-33:20.)  There can be
no conspiracy liability "if the alleged conspirator, though a
participant in the agreement underlying the injury, was not personally
bound by the duty violated by the wrongdoing and was acting only as
the agent or employee of the party who did have that duty."  Reynolds
v. Bement, 36 Cal. 4th 1075, 1090 (2005).  Accordingly, Plaintiff's
civil conspiracy for breach of contract and breach of fiduciary duty
claims against Capstone fail as a matter of law.

///

///

B. Evidence of Intent

Defendants argue "the undisputed evidence demonstrates that [Defendants] did not knowingly enter into any agreed plan with anyone to commit any torts." (Kimzey/Fulton Mot. at 11:7-9; Capstone Mot. at 17-18; Rosales Mot. at 10:26-27. See also Ellis Mot. at 10:28-11:1 ("Ellis did not ask or agree with anyone to commit any torts.") Plaintiff rejoins "there is substantial evidence for a reasonable trier of fact to conclude that Defendants came to a 'meeting of the minds' to commit wrongful acts against Plaintiff and for the benefit of Capstone, that in fact such wrongful acts were committed, and that Plaintiff was damaged as a result." (Opp'n at 33:2-5 (citing evidence).)

i. Ellis and Kimzey

As discussed, *supra*, with regard to Plaintiff's computer fraud claim, a jury could reasonably infer that Ellis authorized (and thus agreed to and knew the tort was planned) Kimzey's acquisition and use of Hanger's patient lists for Capstone's benefit. Further, a jury could reasonably find Ellis intended to aid these torts by establishing Capstone as a competing business.

ii. Fulton

A jury could also reasonably find that Fulton agreed to and aided this conspiracy because she assisted Kimzey in acquiring the Hanger patient list, admitted to soliciting business for Capstone at a brace clinic, discussed a "conspiracy meeting" with Kimzey, and went to work for Capstone with Kimzey and Ellis.

iii. Rosales

A jury cold reasonably find that Rosales also agreed to join Kimzey and Ellis to use Hanger patient information to solicit patients

for Capstone.  Rosales continued to work at Hanger for more than a
month after he signed an employment agreement with Ellis, he failed to
document off-site visits at that time, and the same pattern of a drop
in business at Hanger patient centers was found the months before
Kimzey, Fulton and Rosales left to work for Capstone.  Rosales went to
work for Capstone Visalia, which now sees sixty-five former Hanger
patients.  A jury could reasonably infer from the evidence that
Rosales had participation in the offense.

iv. Capstone

Further, a jury could reasonably find Capstone liable for
conspiracy to commit torts other than breach of contract and breach of
fiduciary duty since Capstone was formed in July 2006, with Ellis as
its executive director, and the acquisition of patient information
from Hanger allegedly occurred after that.

IX. Breach of Contract

Defendants seek summary judgment on Plaintiff's eighth claim
for breach of contract, in which it alleges the Defendants breached
"express contractual obligations arising from the terms of their
respective employment contracts including . . . the provisions of the
Employee Handbook . . . ."  (Compl. ¶ 112.)  Defendants argue that
"the Employee Handbook does not create any contractual rights.  Thus,
the Employee Handbook cannot constitute a contract as a matter of
law."  (Ellis Mot. at 7-9 (citing Krachmar Decl., Ex. D (Employee
Handbook)).)  Kimzey, Fulton and Rosales also argue that they are at-
will employees and thus have no employment contract.  (Rosales Mot. at
11:5; Kimzey/Fulton Mot. at 13.)  Ellis further argues there is no
evidence that he solicited Hanger employees and therefore he could not
be liable for breach of his employment contract.  (Ellis Mot. at

11:10-14.)  Plaintiff rejoins that "breaches of confidentiality obligations [contained in the Confidentiality Acknowledgment/Training Attestation signed by Kimzey and Rosales] may be redressed via contract."  (Opp'n at 34:24-25 (citing Schwarcz Decl., Exs., H, N (Confidentiality Attestations)).)  Defendants rejoin that "there is no admissible evidence that Rosales or Kimzey took any confidential information with them following their employment with plaintiff."  (Reply at 13:7-8.)

Breach of contract under California law requires: (1) existence of a contract, (2) performance by the plaintiff or excuse of nonperformance, (3) breach by the defendant, and (4) damages.  <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal. App. 4th 731, 745 (2001).

<u>A. Ellis</u>

Ellis's employment contract with Hanger contains a clause prohibiting soliciting Hanger employees for a two year period after leaving Hanger.  (Schwarcz Decl., Ex. R. (Ellis employment contract) § 5(b).)  Sufficient evidence exists to create a genuine issue of material fact as to whether Ellis solicited Hanger employees within this time period.  (<u>See</u> C. Cramer Decl. ¶¶ 3, 4, 8; Schwarcz Decl., Ex. G, J, S; Kimzey Dep. at 13:25, 83:1-10; DelValle Decl., Exs., D, E.)

<u>B. Fulton</u>

There is no evidence that Fulton signed a confidentiality agreement with Hanger.  (See Opp'n at 34:19-35:11 (failing to opposed Fulton's Mot.)  Accordingly, summary adjudication on Plaintiff's breach of contract claim is granted in favor of Fulton.

///

///

C. Kimzey and Rosales

Evidence exists that Kimzey and Rosales signed a "Confidentiality Acknowledgment/Training Attestation" in which they agreed to never access confidential information for personal advantage, or to remove such information without authorization. (Schwarcz Decl., Exs., H, N (Confidentiality Attestations).)  Since a genuine issue of material fact exists as to whether Fulton and Kimzey misappropriated Hanger trade secrets, and since doing so would violate the terms of these agreements, a genuine issue of material fact exists on Plaintiff's breach of contract claim against Kimzey and Rosales.

X. Breach of Fiduciary Duty and Duty of Loyalty

Defendants seek summary judgment on Plaintiff's claim in which Plaintiff alleges that "as employees and agents of Hanger, Defendants had access to Hanger's Confidential Information and owed a fiduciary duty and a duty of loyalty to Hanger.  The [alleged] actions of Defendants constitute a willful breach of their fiduciary duties and of loyalty."  (Compl. ¶ 116.)  Defendants argue, "[t]o the extent plaintiff claims that [Kimzey, Fulton, Rosales and Ellis] had a duty to protect its confidential information, there is no admissible evidence that Kimzey and Fulton misappropriated or used any of plaintiff's trade secret/ confidential information."  (Rosales Mot. at 11:17-21.)  In addition, Ellis argues that "[t]here is no evidence that Ellis engaged in any alleged wrongful conduct that would constitute a breach of his fiduciary duty, if any, prior to terminating his employment, and thereby extinguishing any fiduciary duty, with plaintiff."  (Ellis Mot. at 11:21-23.)

The elements of a cause of action for breach of a duty of loyalty are: "(1) the existence of a relationship giving rise to a

duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410 (2007).  The duty of loyalty requires an agent "to act loyally for the principal's benefit in all matters connected with the agency relationship." Id. at 411.  All employees owe a duty of loyalty to their employers.  Otsuka v. Polo Ralph Lauren Corp., 2007 WL 3342721 (N.D. Cal. 2007).

A. Ellis

Since Plaintiff offers no evidence that Ellis breached a fiduciary duty or duty of loyalty, summary adjudication of this claim against Ellis is granted.  (See Opp'n at 35:12-38:14.)

B. Kimzey, Fulton and Rosales

Since Plaintiff has proffered evidence from which a jury could reasonably infer that Kimzey, Fulton, and Rosales acquired confidential information (Hanger patient lists) while employed at Hanger with the purpose of using them to solicit clients for Capstone, and held back business at Hanger the month before their departure in anticipation of working for Capstone, a genuine issue of material facts exists whether they breached a duty of loyalty to Hanger.

SUMMARY

For the reasons stated, summary adjudication of Plaintiff's 18 U.S.C. § 1030(5) claim is granted for all Defendants.  Summary adjudication is also granted on Plaintiff's California Penal Code § 502(c)(3) claim for all Defendants.  Summary adjudication of Plaintiff's 18 U.S.C. § 1030 and California Penal Code § 502 claims against Rosales is granted.  Summary adjudication of Plaintiff's breach of contract claim against Fulton is granted.  Summary adjudication of Plaintiff's breach of fiduciary duty and duty of

1  loyalty claim against Ellis is granted.   Summary adjudication of
2  Plaintiff's civil conspiracy for breach of contract and breach of
3  fiduciary duty claims against Capstone is granted.   The remaining
4  motions are denied.

5          IT IS SO ORDERED.

6  Dated:   April 11, 2008

8  _____
   GARLAND E. BURRELL, JR.
9  United States District Judge