1  **FOLEY & LARDNER, LLP**
ATTORNEYS AT LAW
2  ONE MARITIME PLAZA, SUITE 600
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: 415.434.4484
3  FACSIMILE: 415.434.4507

4  NANCY J. GEENEN, BAR NO. 135968
AARON M. SCHWARCZ, BAR NO. 209275

5  ATTORNEYS FOR PLAINTIFF HANGER PROSTHETICS &
ORTHOTICS, INC.

6

7

8                  UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10                      SACRAMENTO DIVISION

11

12

13  HANGER PROSTHETICS & ORTHOTICS, INC. )   CASE NO. 2:06-CV-02879-GEB-KJM

       PLAINTIFF,                       )   **TRIAL BRIEF OF PLAINTIFF**
14                                       )   **HANGER PROSTHETICS &**
       V.                               )   **ORTHOTICS, INC.**
15                                       )
    CAPSTONE ORTHOPEDIC, INC., A        )
16  CALIFORNIA CORPORATION; GLEN S.     )
    ELLIS, AN INDIVIDUAL; SANTIAGO      )
17  ROSALES, AN INDIVIDUAL; DAVID KIMZEY, )  **TRIAL DATE: JUNE 17, 2008**
    AN INDIVIDUAL; ANGELA FULTON, AN    )
18  INDIVIDUAL; AND DOES 1-15,          )   **HON. GARLAND E. BURRELL, JR.**
                                         )
19         DEFENDANTS.                  )
                                         )
20                                       )
                                         )
21  _____)

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................1

II.  SUMMARY OF EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIMS ...........2

   A.   Overview ...................................................................................2

      **1.   Hanger** ...........................................................................2

      2.   Defendants ........................................................................2

         a.   Capstone ....................................................................2

         b.   Glen Ellis ...................................................................3

         c.   Jim Rosales and Dave Kimzey ...................................3

         d.   Angela Fulton ............................................................4

   B.   Hanger's Trade Secret and Confidential Information ...................4

   C.   Defendants' Schemes and Wrongful Conduct................................5

      1.   Ellis Solicitation of Hanger Practitioners .............................5

      2.   Operation of Capstone Patient Care Facilities.......................6

      3.   Theft of Hanger Trade Secrets and Confidential Information...........7

      4.   Unauthorized Computer Use and Access ..............................8

   D.   Patient Overlap Analysis .......................................................10

III. DISPUTES CONCERNING ADMISSIBILITY OF EVIDENCE.......................11

   A.   Motions in Limine Regarding Witnesses and Testimony ...........11

      1.   Plaintiff's MIL No. 1 to Exclude Testimony that Defendant
           Consulted an Attorney or Relied on Advice of Counsel ................12

      2.   Plaintiff's MIL No. 2 to Exclude Allegations in the
           Complaint No Longer at Issue......................................12

      3.   Plaintiff's MIL No. 3 to Exclude Evidence Relating to Any
           Dismissed Claims Against Defendants...............................12

      4.   Plaintiff's MIL No. 4 to Exclude References to the Financial
           Condition of Plaintiff, Its Corporate Parent, and the Patient
           Care Centers Other than Visalia and Tracy ...........................12

      5.   Plaintiff's MIL No. 5 to Exclude Evidence Documents or
           Testimony from Other Litigation Involving Hanger ...................13

6.   Defendants' MIL No. 1 to Exclude the Testimony of Mark Alcock ................................................................................13

7.   Defendants' MIL No. 2 to Exclude Testimony Not Disclosed in Discovery ...................................................................13

B.   Documents ..................................................................................14

C.   Confidential Patient Files...........................................................14

IV.   PLAINTIFF'S SUMMARY OF POINTS OF LAW ...........................................14

A.   Defendants Capstone, Ellis, Kimzey and Fulton Violated the Federal Computer Fraud and Abuse Act and California Penal Code Section 502 ..................................................................................15

B.   Defendants Misappropriated Trade Secrets ..............................17

1.   Direct Misappropriation.................................................17

2.   Indirect Misappropriation ..............................................20

C.   Defendants Converted Plaintiff's Property ................................20

D.   Defendants Interfered With Hanger's Prospective Economic Advantage ..................................................................................21

E.   Defendants Engaged In Unfair Business Competition ...............22

F.   Defendants Engaged In Civil Conspiracy to Commit Torts........24

G.   Defendants Ellis, Kimzey, and Rosales Breached Agreements Regarding Their Employment by Hanger....................................25

1.   Ellis...............................................................................25

2.   Kimzey and Rosales .......................................................26

H.   Rosales, Kimzey, and Fulton Breached Their Duties of Loyalty to Hanger and Their Fiduciary Duty as Hanger Employees............26

I.   Hanger's Claims are Not Preempted by The California Uniform Trade Secrets Act.......................................................................28

J.   Defendants Are Not Entitled to Attorney's Fees.........................28

V.   REQUESTED RELIEF.......................................................................29

-ii-

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*City Solutions, Inc. v. Clear Channel Communications,*
365 F.3d 835 (9th Cir. 2004) .................................................................................22

*Droeger v. Welsh Sporting Goods Corp.,*
541 F.2d 790 (9th Cir. 1976.) .................................................................................18

*Int'l Airport Centers, LLC. v. Citrin,*
440 F.3d 418 (7th Cir. 2006) .................................................................................16

*Otsuka v. Polo Ralph Lauren Corp.,*
2007 WL 3342721 (N.D. Cal. Nov. 9, 2007) .................................................................26

*Pacific Aerospace & Electronics, Inc. v. Taylor,*
295 F. Supp. 2d 1188 (E.D. Wash. 2003) .................................................................16

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,*
119 F. Supp. 2d 1121 (W.D. Wash. 2000) .................................................................15

*Steinbegt Moorad & Dunn, Inc. v. Dunn,*
2002 WL 31968234 (C.D. Cal. Dec. 26, 2002) .................................................................20

*UniRam Technology, Inc. v. Taiwan Semiconductor Mfg. Co.,*
2007 WL 2572225 (N.D. Cal. September 5, 2007) .................................................................18

## STATE CASES

*A&M Records, Inc. v. Heilman,*
75 Cal. App. 3d 554 (1977) .................................................................................20

*American Credit Indemnity Co. v. Sacks,*
213 Cal. App. 3d 622 (1989) .................................................................................14

*Applied Equipment Corp., v. Litton Saudi Arabia Ltd.,*
7 Cal. 4th 503 (1994) .................................................................................24

*Balboa Ins. Co. v. Trans Global Equities,*
218 Cal. App. 3d 1327 (1990) .................................................................................22

*Bancroft-Whitney Co. v. Glen,*
64 Cal.2d 327 (1966) .................................................................17, 23-24

*Bank of the West v. Superior Court,*
2 Cal. 4th 1254 (1992) .................................................................................23

*Barbara A. v. John G.,*
145 Cal. App. 3d 369 (1983) .................................................................26-27

-iii-

*Cadence Design Systems, Inc. v. Avant! Corp.,*
   29 Cal. 4th 215 (2002) ...................................................................................20

*Cel-Tech Commc'ns., Inv. V. L.A. Cellular Tel. Co.,*
   20 Cal. 4th 163 (1999) ..................................................................................23

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   68 Cal. App. 4th 445 (1998) ..........................................................................26

*Courtesy Temporary Service, Inc. v. Camacho,*
   222 Cal. App. 3d 1278 (1990) ........................................................................23

*First Commercial Mortgage Co. v. Reece,*
   89 Cal. App. 4th 731 (2001) ..........................................................................25

*Greenly v. Cooper,*
   77 Cal. App. 3d 382 (1978) ...........................................................................21

*Holder v. Home Savings and Loan Ass'n,*
   267 Cal. App. 2d 91 (1968) ...........................................................................24

*Huong Que, Inc. v. Luu,*
   150 Cal. App. 4th 400 (2007) .............................................................15, 23, 26

*Kidron v. Movie Acquisition Corp.,*
   40 Cal. App. 4th 1571 (1995) ........................................................................24

*Klamath-Orleans Lumber, Inc. v. Miller,*
   87 Cal. App. 3d 458 (1978) ...........................................................................15

*Korea Supply Co. v. Lockheed Martin Corp.,*
   29 Cal.4th 1134 (2003) .................................................................................21

*McKell v. Wash. Mut., Inc.,*
   142 Cal. App. 4th 1457 (2006) .......................................................................20

*Morlife, Inc. v. Perry,*
   56 Cal. App. 4th 1514 (1997) .....................................................................18-19

*Mox, Inc. v. Woods,*
   202 Cal. 675 (1927) ......................................................................................25

*Palm Springs-La Quinta Development Co. v. Kieberk Corp.,*
   46 Cal. App. 2d 234 (1941) ...........................................................................20

*PMC, Inc. v. Kadisha,*
   78 Cal. App. 4th 1368 (2000) ....................................................................17, 20

*Reeves v. Hanlon,*
   33 Cal. 4th 1140 (2004) ..........................................................................18, 21-22

*Youst v. Longo,*
   43 Cal.3d 64 (1987) ......................................................................................21

-iv-

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

18 U.S.C.,
    Section 1030(a)(4) ...........................................................................................15
    Section 1030(e)(11) ..........................................................................................16
    Section 1030(g) ................................................................................................15

Federal Computer Fraud and Abuse Act ("CFAA") .............................................. 15-16

Federal Rules of Civil Procedure,
    Rule 26 ......................................................................................................13, 14
    Rule 37 .............................................................................................................14

**STATE: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Business and Professions Code
    Section 17200 .............................................................................................. 22-23

California Civil Code,
    Section 3426.1(d) .............................................................................................18

California Penal Code
    Section 502 ................................................................................................15, 28
    Section 502(c)(1) ..............................................................................................16
    Section 502(c)(2) ..............................................................................................16
    Section 502(c)(3) ..............................................................................................28
    Section 502(c)(7) ..............................................................................................16
    Section 502(e)(1) ..............................................................................................17

California Uniform Trade Secrets Act ("UTSA") ..................................................17, 28

SFCA_1390204.4

# I.   INTRODUCTION

This is a case that starts with numerous breaches of a non-solicitation provision in an employment agreement, continues with the theft of trade secrets and confidential medical information of patients, and ends with a five-facility orthotics and prosthetics business that used Plaintiff's trade secrets and confidential information to compete unfairly with the Plaintiff's operations in the San Joaquin Valley.

Defendants' defenses to these charges can be distilled to one oft repeated mantra: "I didn't do it."  In so doing, Defendants ignore the personal observations and first hand testimony of the many witnesses who were also solicited to join the new company, but ultimately declined to be involved.

Defendants Glen Ellis, Jim Rosales, David Kimzey and Angela Fulton– all former employees of Plaintiff Hanger Prosthetics & Orthotics, Inc. ("Hanger" or "Plaintiff") – formed a competing business, Defendant Capstone Orthopedic, Inc. ("Capstone"), and used unlawful means to recruit employees and generate a patient care list.

Defendant Ellis, Plaintiff's former regional vice president for its Northern California region and co-founder of Capstone, actively targeted, solicited and recruited Plaintiff's employees to join Capstone and displace Hanger from relevant markets that he previously supervised.  Ellis, on behalf of Capstone, entered into employment agreements with Defendants Kimzey and Rosales while Kimzey and Rosales were still employees of and practice managers at Hanger facilities.

Kimzey and Fulton improperly accessed computers; Rosales, Kimzey and Fulton stole trade secrets, and breached their duties of loyalty to Plaintiff by engaging in numerous wrongful acts for the benefit of Capstone, including the solicitation of additional Hanger employees, improper solicitation of customers, and failure to perform their job responsibilities.  The monthly sales for Hanger's Visalia and Tracy clinics dropped significantly during the time period that Kimzey, Fulton and Rosales were planning their departures from Hanger and in anticipation of working for Capstone. Defendants' own records demonstrate an overlap of over 100 patients that were formerly

1

1  seen at Hanger.  Some of Capstone's patient files contain exact duplicate copies of

2  materials from Hanger's corresponding patient files and indicate that Defendants

3  interrupted medical care in order to secure the revenue for Defendant Capstone.

4     The ultimate design of Defendants' scheme was to maximize the disruption to

5  Hanger's business operations and to capture practices that were part of Ellis' former

6  supervisory domain and thereby secure turn-key operations for Capstone.

7     Hanger suffered damages in the form of lost profits, out of pocket expenses, and

8  lost future revenues.  Hanger's financial expert estimated the lost profits ranging from at

9  least $154,077 to $238,244 through July 2007 and out-of-pocket expenses of at least

10  $59,136.  With respect to the future economic losses, Hanger's expert report specified the

11  model analysis that is used to determine such losses for the actual, as opposed to

12  hypothetical, overlap patients.  Based on an analysis of the actual patient files, Hanger

13  estimates its future economic losses to be not less than $150,000, but evidence of such

14  damages shall be presented at trial on a patient by patient analysis.

15  **II.     SUMMARY OF EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIMS**

16      **A.     Overview**

17  Hanger and Capstone are competitors in the business of manufacturing,

18  fabricating, fitting, servicing, and selling orthotic and prosthetic ("O&P") devices.

19      **1.     Hanger**

20  Plaintiff Hanger operates prosthetic and orthotics patient care centers in the cities

21  of Tracy and Visalia, California.  Hanger's current employees will testify about their

22  personal observations of the activities of the Defendants.

23      **2.     Defendants**

24         **a.     Capstone**

25  Capstone was officially formed in July 2006 and co-founded by Ellis, Hanger's

26  former regional vice president for Northern California, immediately upon his resignation

27  from Hanger.  Hanger and Capstone are direct business competitors in the Northern

28  California marketplace.

2

### b.   Glen Ellis

Ellis was Hanger's regional vice president for Northern California. Ellis was responsible, in relevant part, for overseeing the patient care centers, including establishing and achieving financial goals and overseeing salary administration.  As part of his job, Ellis had access to sensitive business information, including the financial performance of the patient care centers under his control and salary information for its practitioners and other employees.

Ellis executed an "Employment and Non-Solicitation Agreement" with Hanger on March 31, 2001.  The Agreement references his access to confidential information as part of his senior executive position and includes a non-solicitation clause that expressly precludes any proactive interference with Hanger and its employees for a two-year period upon Ellis' resignation from the company.

Upon forming Capstone, Ellis became the CEO and one of three directors of Capstone.  He admits that his responsibilities include "everything" except administration and finance.  Ellis is the point person for recruiting, negotiating and interacting with potential Capstone employees, even before Capstone's formation.

### c.   Jim Rosales and Dave Kimzey

Rosales and Kimzey were practice managers for Hanger's patient care centers in Tracy, California and Visalia, California, respectively.  Capstone established patient care centers in those same two locations, and in the case of Capstone's Visalia clinic, the very same office space.  In fact, three of Capstone's four business locations were started and operated by the former Hanger practice managers from those very same locations.

As practice managers of Hanger facilities, both Rosales and Kimzey signed Confidential Acknowledgment/Training Attestations pursuant to which each agreed to protect information about Hanger's "Patient Health Information," computer systems and computer access, and other proprietary information, including financial information, trade secrets, research and development, operational information or instruction manuals. The Confidentiality Acknowledgment/Training Attestations specifically prohibit, *inter alia*,

3

1 | the removal of such information without authorization or the use or disclosure of such
2 | information for personal interest or advantage.

3 |        **d.**     **Angela Fulton**

4 |      Fulton, the last named defendant, is the daughter of Kimzey and a former
5 | administrative assistant /soft goods fitter at Hanger's Visalia location, who subsequently
6 | became an employee of Capstone-Visalia.  Fulton actively and improperly accessed
7 | confidential Patient Health Information and Hanger trade secrets at the direction of both
8 | Ellis and Kimzey.

9 | **B.**    **Hanger's Trade Secret and Confidential Information**

10 |      The lifeblood of an O&P business is its existing patient-customer base and future
11 | patient-customer referral stream.  As part of its business operations, Hanger receives,
12 | develops and maintains confidential patient information, including social security
13 | numbers, medical diagnoses, prescriptions, treatment records, insurance data, addresses,
14 | telephone numbers and other contact information.  Hanger also maintains confidential
15 | business information relating to referral sources and payors (insurance companies) and
16 | has developed internal business forms to help its employees work more efficiently.

17 |      Hanger discloses this confidential information to employees only on a need-to-
18 | know basis, and all Hanger employees are prohibited from accessing, using or disclosing
19 | such confidential patient information unless for authorized Hanger business purposes.

20 |      Hanger's confidential information is stored in both hard-copy form (e.g., patient
21 | files) and electronically on computers.  Hanger owns and operates numerous computers,
22 | computer systems and computer networks that are used to conduct Hanger's business
23 | operations.  Hanger issues passwords to its employees who have access to its computer
24 | networks in order to limit access to confidential information maintained on those
25 | computers, including patient-customer information.

26 |      The fact that such information is customarily treated as proprietary in the O&P
27 | industry is underscored by Capstone's definition of its confidential business information,
28 | ///

4

1   including customer lists, as "trade secrets" in its employment agreements with Kimzey

2   and Rosales.

3   ## C.   Defendants' Schemes and Wrongful Conduct

4   ### 1.   Ellis Solicitation of Hanger Practitioners

5   Ellis actively started his preparations for Capstone during his tenure at Hanger by

6   meeting with the other (future) Capstone co-founders and evaluating funding options, but

7   contends that he did not engage in solicitation activities while still a Hanger employee.

8   Ellis provided his resignation notice on May 14, 2006, and worked his final day at

9   Hanger on July 14, 2006. Capstone was legally formed on July 21, 2006. Ellis solicited

10  four of five practice managers from Hanger in the first year of Capstone's operations.

11  Part of the solicitation was an offer to become an owner of Capstone.

12  On July 18, 2006, just two business days after Ellis' departure from Hanger and

13  before the formation of Capstone, Kimzey emailed Capstone inquiring about a job

14  opportunity. Kimzey testified that he emailed Capstone because he saw an advertisement

15  in the "O&P Business News" journal. However, a review of O&P publications from the

16  relevant time-period demonstrates conclusively that no advertisement for Capstone was

17  run until the August 15, 2006 issue. "O&P Business News" is a bi-monthly publication.

18  No advertisement for Capstone is located in the July 15, 2006 or August 1, 2006

19  publications.

20  Ellis, on behalf of Capstone, and Kimzey executed an "Employment Agreement"

21  on August 18, 2006 to establish an O&P business in Visalia. Kimzey admits that after

22  signing this Employment Agreement he viewed himself as an agent of Capstone.

23  Rosales was the practice manager for Hanger's Tracy, California patient care

24  center until he joined Capstone. On September 17, 2006, Rosales sent an "unsolicited"

25  email inquiry to Capstone while still a Hanger employee. On September 21, 2006, Ellis,

26  on behalf of Capstone, and Rosales signed the Capstone Employment Agreement, only

27  *four* days after receiving Rosales' email. Rosales admitted that he had *never* used the

28  ///

5

1  "comcast" email address referenced as the "sender" account before transmitting this

2  email to Capstone.

3         As a further example, Ellis and Kimzey also solicited John Wettstein – the

4  prosthetist working at Hanger's Visalia patient care center – to come work for Capstone.

5  Ellis and Kimzey met with Wettstein for dinner.  Among other enticements, Ellis

6  promised Wettstein salary and health insurance coverage during the down time between

7  his resignation from Hanger and starting as a Capstone employee. Kimzey then solicited

8  all other Hanger Visalia employees to work for Capstone with similar promises and

9  indicated to at least one employee that Hanger would no longer exist in Visalia.

10        In addition to soliciting practice managers from the Hanger Visalia and Tracy

11  patient care facilities, Ellis also tried to recruit Hanger employees from other locations.

12  For example, Ellis recruited both Craig and Teresa Cramer after the initiation of this

13  lawsuit, but while still under the two year non-solicitation agreement.  The Cramers

14  worked for Hanger in Fresno, California until April 2007.  The Fresno patient care center

15  fell within Ellis' former territory at Hanger, and Craig Cramer had previously reported to

16  Ellis.  Ellis instructed the Cramers to send emails through Capstone's website in order to

17  make their recruitment, in Ellis' words, appear legal.  Ellis further promised to pay the

18  Cramers one week salary before they actually started working in Capstone's Fresno

19  office to avoid the appearance of an improper transition from Hanger to Capstone.

20  Finally, Ellis requested that the Cramers – while still employed by Hanger – recruit other

21  Hanger employees to work for Capstone.

22         **2.      Operation of Capstone Patient Care Facilities**

23        Kimzey did not immediately resign from Hanger after entering into his

24  employment agreement with Capstone on August 18, 2006.  Rather, Kimzey (and Fulton)

25  continued on at Hanger until they were both terminated on October 6, 2006.  Kimzey

26  admitted that he had hoped to work for Hanger until the Capstone business was fully

27  functional so that he could literally transition from one day to the next.

28  ///

6

SFCA_1390204.4

1    Kimzey acknowledged assisting Ellis with the purchase of equipment to prepare

2 for the Capstone-Visalia business while still employed by Hanger.  Kimzey faxed Ellis a

3 list of improvements for the office facility that Hanger was then still leasing on

4 August 25, 2006.  The fax was transmitted from Hanger's Visalia patient care center.

5 Defendants anticipated that Capstone's Visalia business would be operational by early

6 November 2006.  Kimzey told one Visalia employee that if Ellis ever visited Hanger's

7 Visalia clinic with the landlord of that leased premises, that she should pretend that she

8 did not know Ellis.  Kimzey anticipated tendering a two-week resignation notice in

9 mid-October 2006.  This timing was in fact predicated on Capstone's ability to secure the

10 lease of Hanger's then existing location in Visalia.

11    Although Rosales signed his employment agreement with Capstone on

12 September 21, 2006, Rosales did not tender his resignation from Hanger until November

13 3, 2006. While still a Hanger employee, Rosales employed and shared Hanger's Tracy

14 center exclusively with, an office administrator named Julia Sanchez for several years.

15 Sanchez sent an "unsolicited" email inquiry to Capstone on October 10, 2006 and

16 resigned by email on October 11, 2006.  Sanchez immediately started at Capstone.

17    In late October and November 2006, Rosales was often absent, failed to document

18 off-site patient visits, and largely refused to assist with the operation of Hanger's Tracy

19 patient care center.

20    **3.    Theft of Hanger Trade Secrets and Confidential Information**

21    Just one month prior to his termination, Kimzey requested that the office

22 administrator, Yolanda Mosqueda, provide him with a list of important payors (i.e.,

23 insurance companies).  Kimzey indicated that Capstone's contracting person was in the

24 process of preparing contracts and could use this information.  Mosqueda provided the

25 requested information to Kimzey.

26    Another witness – John Wettstein – was told by Kimzey that he believed it was

27 appropriate to take Hanger's "patient recall list" for use in his new competing business.

28 A "patient recall list" is used to contact Hanger patient-customers to inform them about

7

1   upcoming Hanger product demonstrations and/or clinical check-ups, and contains

2   confidential information including patient names, addresses, telephone numbers and

3   patient care data such as the medical devices or services that patients have received in the

4   past. Kimzey also told Wettstein that he was holding back on work and working referral

5   sources in anticipation of the new business venture.

6        A third witness – Shawna Rhyne – observed Fulton and Kimzey printing

7   documents off her Visalia desktop computer on October 5, 2006, and was told by Fulton

8   that it was a patient recall list dating back to 2004. Rhyne personally observed that

9   several inches worth of paper had already been printed by Fulton, and that these print-

10  outs contained patient data. When Rhyne asked whether Fulton or Kimzey needed

11  anything else, Fulton responded that Rhyne should leave unless she wanted to participate

12  in a "conspiracy meeting."

13       Later that evening, Fulton called Rhyne at her mother's house and demanded her

14  computer password so that Fulton could continue to print the patient list, which

15  apparently had been interrupted. Rhyne heard Kimzey in the background stating that he

16  was the boss and that Rhyne had to give Fulton the password. Rhyne provided Fulton

17  with her password as requested.

18       Fulton also informed Rhyne that patient clinics at the office of Dr. Barnaby were

19  cancelled by Hanger because they found out that Kimzey's and Fulton's true motive was

20  to solicit work for Capstone. Fulton told Rhyne that she suspected Mosqueda was a

21  "Hanger spy," and that Rhyne should not say anything further to Mosqueda. Notably,

22  Dr. Barnaby's office was referenced in Fulton's electronic diary written in July 2006 as a

23  place from which to secure assurance of future business. Fulton admitted that she

24  informed the front office staff in Dr. Barnaby's office about Defendants' future business

25  plans, but denies soliciting them for referrals.

26      **4.**    **Unauthorized Computer Use and Access**

27       From about June 2006 until October 9, 2006, Fulton was in possession, custody

28  and control of a Hanger laptop computer that was not stored at the Visalia clinic. The

8

laptop computer was previously used by Hanger for practitioner use, but Kimzey permitted his daughter to use the computer after he had received a replacement laptop.

Fulton testified that she retained sole control of the laptop computer from June 2006 until October 9, 2006. Fulton returned the laptop computer only after Mosqueda specifically requested its return. Fulton at first told Mosqueda that the laptop was her property, but then relented and returned the computer several hours later.

Hanger retained Mark Alcock, a computer forensic analyst, to review its Visalia computers, including Fulton's laptop computer, following the termination of Kimzey and Fulton. Alcock observed that a mass deletion of data had taken place – i.e., every document, e-mail, database, and picture on the laptop had been deleted. A total of 12,307 items had been deleted with most of the deletion activity occurring in October 2006. Alcock observed file fragments that included information regarding Hanger's patients, patient contact information, related services and products, emails, Microsoft Word documents, Excel documents and assorted databases. Finally, Alcock found a diary-like entry on the laptop computer dated July 25, 2006 that referenced a meeting between Kimzey and Ellis the previous evening on July 24, 2006. Fulton acknowledged writing the diary-like entry on that laptop computer.

Mosqueda also observed Fulton connecting an external thumb drive (an electronic storage device) to a Hanger desktop computer in or about September 2006. Mosqueda observed that Kimzey assisted Fulton with the operation of the external storage device. Fulton told Mosqueda that she was copying Hanger business forms. Hanger does not use or authorize office administrators to use external storage devices for transfer of data.

The thumb drive that Mosqueda witnessed Fulton and Kimzey using was a purple and silver color, which was not Hanger-Visalia office equipment. In fact, there was only one office thumb drive, a black-colored device that Mosqueda had purchased for Kimzey's use. Mosqueda, however, never observed Kimzey or anyone else at the office using the black-colored thumb drive.

///

9

1    Alcock observed that an external, mass storage device (such as a thumb drive) had

2    been connected on several occasions to both Fulton's laptop computer and one of the

3    desktop computers located at the Visalia patient care center.  That desktop computer

4    contained very sensitive Hanger patient information, including over 40,000 social

5    security numbers.  Alcock observed that the same external mass storage device had been

6    connected to both the laptop and desktop computers.

7    After Kimzey and Fulton were terminated on October 6, 2006, documented

8    evidence demonstrates continued unauthorized access to Hanger's computer systems.

9    Specifically, Capstone produced several internal Hanger emails from September 2006.

10   The footer information on these documents indicates they were printed from Hanger's

11   extranet on October 8, 2006 (a Sunday).  Although Kimzey's name appears in the header

12   of the documents, Kimzey testified that he did not recall printing off any materials from

13   Hanger's extranet site after his termination, nor could he think of a reason why it was

14   printed.

15   From October 11, 2006 until October 19, 2006, Hanger's computer system was

16   accessed by someone using the password for the Tracy office.  The password was still in

17   use after Sanchez' departure because Rosales was still working for Hanger at the Tracy

18   patient care facility.  No other Hanger employee had access to Hanger's computer system

19   using Sanchez's password.  Remotely accessing Hanger's computer network allows

20   access to Hanger's forms and coding worksheets, vendor information, and numerous

21   policies and manuals.

22   **D.    Patient Overlap Analysis**

23   Defendants' own records demonstrate that Rosales and Kimzey, as Capstone

24   employees, saw a large number of overlap prosthetic and orthotic patients that had been

25   previous Hanger patients.

26   The monthly revenue for the Tracy center dropped precipitously starting in

27   October 2006.  In fact, the October 2006 sales set an all-time monthly low for Tracy

28   ///

10

1  going back over five years.  The unusually low level of sales continued through and after

2  Rosales resignation in November 2006.

3      In fact, over 65 patients that were formerly seen at Hanger's Tracy center are now

4  Capstone-Tracy patients.  This includes at least one patient account where witnesses

5  observed Rosales deriding other Hanger personnel's ability to provide appropriate

6  services and disclosing his personal contact information over the telephone while still

7  employed by Hanger.  Eight prosthetic patients that were formerly seen at Hanger were

8  seen at Capstone-Tracy in 2006 after Rosales' resignation, including several that were

9  seen within one-to-two weeks after Rosales' departure.  Sixteen orthotic patients formerly

10  seen at Hanger were seen at Capstone-Tracy in 2006.

11     Four of the five prosthetic patient-customers seen at Capstone-Visalia in 2006

12  following Kimzey's and Fulton's termination were formerly serviced at Hanger.  An

13  additional nine orthotic patient-customers seen at Capstone-Visalia in 2006 were

14  formerly serviced at Hanger.  Hanger's monthly sales for its Visalia patient care center

15  dropped significantly in September 2006 in comparison to prior monthly sales and did

16  not recover to pre-existing levels until May 2007.

17     Moreover, Hanger reviewed several of Capstone's patient files as produced in this

18  action.  The Capstone patient files contained, among other things, the following: (i) exact

19  duplicate copies of Hanger's patient files; (ii) patient prescriptions for treatment at

20  Hanger patient care centers; (iii) "follow-up" visits at Capstone where the first

21  documented visit was at Hanger and a follow up appointment at Hanger was cancelled;

22  (iv) incomplete or no documentation of a patient's treatment;  and (v) documentation of

23  irregular progression of care and billing.

24  **III.    DISPUTES CONCERNING ADMISSIBILITY OF EVIDENCE**

25       A.    **Motions in Limine Regarding Witnesses and Testimony**

26     Hanger filed a total of five motions in limine, all of which were opposed by

27  Capstone:

28  ///

SFCA_1390204.4

1.   **Plaintiff's MIL No. 1 to Exclude Testimony that Defendant**
     **Consulted an Attorney or Relied on Advice of Counsel**

This dispute concerns the admissibility of evidence that Ellis consulted an attorney or relied on advice of counsel as a justification for his actions. Because Defendants failed to properly plead an "advice of counsel" affirmative defense, this evidence is not relevant to any issue or claim in the case and would only serve to waste time and mislead the jury. In their Opposition to Plaintiff's MIL No. 1, Defendants argue that this evidence is relevant because Hanger alleged in its Complaint that Ellis unlawfully took action while still serving as Hanger's Vice President/Market Leader.

2.   **Plaintiff's MIL No. 2 to Exclude Allegations in the Complaint**
     **No Longer at Issue**

This dispute concerns the admissibility of evidence relating to allegations in the complaint no longer at issue for trial. Hanger's position is that all such evidence should be excluded from trial because it is irrelevant and unduly prejudicial. Defendants contend that Hanger's motion *in limine* is overbroad and that such evidence is admissible for, among other reasons, impeachment of Hanger's person most knowledgeable.

3.   **Plaintiff's MIL No. 3 to Exclude Evidence Relating to Any**
     **Dismissed Claims Against Defendants**

This dispute concerns the admissibility of evidence relating to any dismissed claim against Defendants. Hanger contends that all such evidence should be excluded from trial because it is irrelevant and unduly prejudicial. Defendants contend that such evidence is relevant to the other remaining claims.

4.   **Plaintiff's MIL No. 4 to Exclude References to the Financial**
     **Condition of Plaintiff, Its Corporate Parent, and the Patient**
     **Care Centers Other than Visalia and Tracy**

This dispute concerns the admissibility of the financial condition of Plaintiff Hanger and its affiliates. Such evidence is wholly irrelevant to the matters at hand and will only serve to improperly influence the jury in their determination of damages, and

12

1   will mislead the jury as to the nature of the marketplace and scale of competition in

2   Visalia and Tracy.  In their opposition, Defendants' argue that evidence relating to

3   Plaintiff's profits in the Northern California market is directly relevant to this matter.

4   **5.   Plaintiff's MIL No. 5 to Exclude Evidence Documents or**

5   **Testimony from Other Litigation Involving Hanger**

6   This dispute concerns the admissibility of documents and testimony from other

7   litigation to which Hanger or any of its witnesses in the instant action is or was a party,

8   including pleadings, discovery responses and deposition transcripts, as well as any

9   reference to the resolution of any such litigation, including the existence or substance of

10  any settlement negotiations or agreements.  Hanger contends that all such evidence

11  should be excluded from trial because it is irrelevant and unduly prejudicial.  Defendants

12  contend that it is relevant for, among other things, impeachment of witnesses.

13  Capstone filed two motions in limine, each of which is opposed by Hanger:

14  **6.   Defendants' MIL No. 1 to Exclude the Testimony of Mark**

15  **Alcock**

16  This dispute concerns the status and testimony of Mark Alcock, Hanger's

17  computer forensic investigator.  Defendants argue that he was neither timely nor properly

18  designated as an expert witness.  Hanger opposes this MIL on the basis that Defendants

19  have known of Mark Alcock and the entire contents of his testimony for nearly a year and

20  a half.  In addition, Hanger argues that none of the factors necessary for exclusion of an

21  expert witness such as malicious intent, unfair advantage or unfair surprise are present

22  here.

23  **7.   Defendants' MIL No. 2 to Exclude Testimony Not Disclosed in**

24  **Discovery**

25  This dispute concerns the offer of testimony of nine Hanger witnesses on the basis

26  that Hanger did not supplement its Rule 26 Initial Disclosures before the close of

27  discovery to list these witnesses.  Hanger opposes this MIL on three grounds: (a) Rule 26

28  does not require a party to supplement its Initial Disclosures to include witnesses if the

13

SFCA_1390204.4

1  witnesses are otherwise made known during the discovery process; (b) Rule 37 sanctions

2  excluding witness testimony are inappropriate when a failure to supplement Initial

3  Disclosures is harmless, as here, where Defendants deposed only one Hanger witnes; and

4  (c) Hanger may use any of the identified witnesses for purposes of impeachment or

5  rebuttal.  Fed. R. Civ. Proc. 26 and 37.

6      **B.    Documents**

7      Plaintiff and Defendants each filed and served written objections to the documents

8  identified on both Plaintiff's and Defendants respective Exhibit Lists.  Plaintiff expects to

9  meet and confer on foundation and relevance objections so as to resolve as many

10  objections as possible prior to submission of the final exhibits to the Court.

11      Plaintiff has offered to stipulate to the authenticity of all corporate business

12  records produced in discovery in order to avoid the necessity of calling a custodian of

13  records witness to the stand.  Further, Plaintiff has offered to stipulate to the authenticity

14  and foundation of emails, letters, diary entries, and contracts in those circumstances

15  where the document has been properly authenticated by the author, recipient or signatory

16  during deposition.  Finally, Plaintiff has offered to stipulate to the use of copies in lieu of

17  the original business records and patient files at trial.

18      **C.    Confidential Patient Files**

19      Plaintiff has redacted the names and identifying personal data from each of the

20  patient files that appear on its Exhibit List.  Each patient file is identified with an alias

21  similar to the procedures used in litigation involving minors.  For example, a patient file

22  is referred to as Patient No 1. "Rosa A".  The patient files are in alphabetical order from

23  Patient No. 1 to Patient No. 110.

24  **IV.   PLAINTIFF'S SUMMARY OF POINTS OF LAW**

25      A departing employee may not proactively try to obtain the business of his

26  employer's current customers before leaving.  *See, e.g., American Credit Indemnity*

27  *Co. v. Sacks*, 213 Cal. App. 3d 622, 636 (1989) (finding ex-employee's "announcement"

28  letter to former customers amounted to improper solicitation because it entreated them to

14

1    call her to discuss her new company's insurance policies and for assistance after their

2    current policies expired).  Nor may a departing employee use his or her employer's

3    confidential information to solicit customers, either before or after leaving the company.

4    *See, e.g.*, *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 466 (1978)

5    (describing former employees' use of confidential customer list as "patent act of unfair

6    competition").  Finally, an employee, while still employed, owes an undivided loyalty to

7    his employer, which precludes acts that are contrary to the best interests of the employer.

8    *See, e.g.*, *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007).[1]

9    **A.    Defendants Capstone, Ellis, Kimzey and Fulton Violated the Federal**

10   **Computer Fraud and Abuse Act and California Penal Code**

11   **Section 502**

12   Plaintiff's first claim for relief is for Computer Fraud and Abuse.  The subsection

13   of the Computer Fraud and Abuse Act ("CFAA") relevant to this action is:

14   18 U.S.C. § 1030(a)(4), which prohibits (1) the accessing of a
     'protected computer;' (2) without authorization or by
15   exceeding authorization; (3) done 'knowingly' and with
     'intent to defraud'; which (4) as a result 'further[ed] the
16   intended fraud and obtain[ed] anything of value.'

17

18   The term "defraud" for purposes of section 1030(a)(4) of the CFAA simply means

19   wrongdoing and does not require proof of common law fraud.  *See Shurgard Storage*

20   *Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash.

21   2000).  The CFAA provides that "any person who suffers damage or loss ... may maintain

22   a civil action ... for compensatory damages ...."  18 U.S.C. § 1030(g).  "Loss" is defined

23

24   [1] In the Joint Pretrial Statement, Defendants included, as a disputed legal issue,
     whether defendants Rosales, Kimzey and Fulton "could make lawful preparations to
25   terminate their at-will employment with Hanger to join a competitor."  Dkt. # 119 at
     29:28-30:2.  Hanger does not contend that at-will employees may not seek out or accept
26   new employment from a competitor while still working for their current employer.
     Hanger also does not dispute that the defendants were at-will employees of Hanger.  The
27   factual and legal issues here, however, surround the *unlawful* conduct of the defendants.
     The issue is therefore not whether they *could* make lawful preparations.  Rather, the issue
28   is whether they actually *did* act lawfully in making such preparations.

15

PLAINTIFF'S TRIAL BRIEF
CASE NO. 2:06-CV-02879-GEB-KJM

1   as "any reasonable cost to any victim, including the cost of responding to an offense,

2   conducting a damage assessment, and restoring the data ...." 18 U.S.C. § 1030(e)(11).

3       Employees that access their employer's computers to obtain or delete business

4   information for their own personal benefit and/or the benefit of a competitor act "without

5   authorization" and/or "exceed authorization" within the meaning of the statute. *See, e.g.,*

6   *Int'l Airport Centers, LLC. v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006) (finding

7   employee acted without authorization under CFAA because the employee's "breach of

8   his duty of loyalty [in deleting computer files] terminated his agency relationship ... and

9   with it his authority to access the laptop, because the only bases of his authority had been

10  that relationship"). Both former employees and their new companies who seek a

11  competitive edge through wrongful use of information from the former employer's

12  computer system face liability under this section of the CFAA. *See, e.g., Pacific*

13  *Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1196 (E.D. Wash. 2003)

14  (noting CFAA's civil remedies permit company to sue former employees and their new

15  companies who seek competitive edge through wrongful use of information from former

16  employer's computer system).

17      Plaintiff's second claim for relief is for Computer Abuse under California Penal

18  Code section 502 which prohibits the following relevant conduct:

19      Cal. Penal Code § 502(c)(1) prohibits (1) knowingly
        accessing and (2) without permission altering, damaging,
20      deleting, destroying, or otherwise using any data, computer,
        computer system, or computer network in order to either (3a)
21      devise or execute any scheme or artifice to defraud, deceive,
        or extort, or (3b) wrongfully control or obtain money,
22      property, or data.

23      Cal. Penal Code § 502(c)(2) prohibits (1) knowingly
        accessing and (2) without permission taking, copying, or
24      making use of any data from a computer, computer system, or
        computer network ...."
25
        Cal. Penal Code § 502(c)(7) prohibits (1) knowingly and (2)
26      without permission accessing or causing to be accessed any
        computer, computer system, or computer network.
27

28  ///

16

1   The statute authorizes owners of computers or computer systems who have been

2   caused "damage or loss" by any of the above activity to bring a civil action against the

3   violator for compensatory damages. Cal. Penal Code § 502(e)(1). The statute provides

4   that compensatory damages include any expenditure reasonably and necessarily incurred

5   by the owner to verify that a computer system was not altered, damaged, or deleted by the

6   unauthorized access.

7   Fulton and Kimzey accessed Hanger computers for improper purposes, including

8   the solicitation of Hanger patients for Capstone. Witnesses Mosqueda and Rhyne

9   observed these actions. As just one example of improper access and use, the patient

10   recall list is a trade secret of Hanger and has economic value to Hanger because of the

11   confidential information on that list. Kimzey admitted he wanted to obtain the patient

12   recall list for Capstone. Further, revenues for the Visalia office dropped dramatically

13   prior to the departure of Kimzey and Fulton. Finally, Hanger's damages expert, Suzanne

14   Stuckwisch, will opine that these actions caused a loss in the nature of both lost profits

15   and loss of future revenues based on the actual patient overlap lists.

16   Capstone and Ellis are liable for the unlawful acts of their employees because Ellis

17   authorized, directed, and/or participated in the unlawful acts. *Bancroft-Whitney Co. v.*

18   *Glen*, 64 Cal.2d 327, 353 (1966) (finding that where evidence indicated that company

19   was aware of or ratified breach of fiduciary duty by employee of competitor company,

20   liability would attach for employee's acts because having reaped the benefits of the

21   improper conduct, the company could not disclaim the burden); *PMC, Inc. v. Kadisha*,

22   78 Cal. App. 4th 1368, 1379 (2000) ("[T]he individual officer or director will be [liable

23   for the corporation's torts when] he authorizes, directs or in some meaningful sense

24   actively participates in the wrongful conduct.")

25   **B.   Defendants Misappropriated Trade Secrets**

26   **1.   Direct Misappropriation**

27   Under California's Uniform Trade Secrets Act ("UTSA"), a trade secret is:

28   information, including a formula, pattern, compilation,
    program, device, method, technique, or process, that:

17

1

> (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d).

2

3

4

5    "[W]here the employer has expended time and effort identifying customers with

6    particular needs or characteristics," such information is a trade secret. *Morlife, Inc. v.*

7    *Perry*, 56 Cal. App. 4th 1514, 1521 (1997).

8         "A violation of the UTSA occurs when an individual misappropriates a former

9    employer's protected trade secret client [or customer] list, for example, by using the list to

10   solicit clients [citation] or to otherwise attain an unfair competitive advantage [citation]. "

11   *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1155 (2004).  Trade secret misappropriation may be

12   proved by circumstantial as well as direct evidence. *See Droeger v. Welsh Sporting*

13   *Goods Corp.*, 541 F.2d 790, 792 (9th Cir. 1976.)  Indeed, circumstantial evidence is often

14   the norm in trade secret cases:

15

> [m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of … circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable that not that what plaintiffs alleged happened did in fact take place.

16

17

18

19   *UniRam Technology, Inc. v. Taiwan Semiconductor Mfg. Co.*, 2007 WL 2572225, *5

20   (N.D. Cal. September 5, 2007) (citation omitted).

21        Hangers's confidential business information, including its patient-customer data, is

22   procured by substantial time, effort, and expense, and is the subject of reasonable anti-

23   disclosure measures.  Hanger's electronic patient information system contains referral

24   source information specific to that patient file, includes prescriptions, treatment records,

25   and patient personal and financial information.  Hanger expends considerable resources

26   developing these and other Hanger business forms.

27        The information is protected by limiting employee access, execution of employee

28   Confidentiality/Training Attestations, and employee training on privacy statutes and

18

operation policies and procedures. These files have economic value because "disclosure would permit a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested." *Morelife, Inc.*, 56 Cal. App. 4th at 1522. Hanger took reasonable steps to protect this information. *See id.*

Here, there is both direct and circumstantial evidence of trade secret misappropriation. On October 5, 2006, Rhyne witnessed Fulton and Kimzey printing-off a patient recall list that Fulton stated dated back to 2004. Rhyne was told she should go home unless she wanted to participate in a "conspiracy meeting." Rhyne never saw the printed-off patient recall list again at Hanger's business premises. Notably, Kimzey had previously told John Wettstein that Kimzey believed it was appropriate to take a patient list to his new business. Yolanda Mosqueda observed Fulton and Kimzey connecting a personal thumb drive to a desktop computer in September 2006. Fulton told Mosqueda that she was downloading Hanger's business forms.

Kelly Alltucker observed that Julia Sanchez's password was being used to access Hanger's computer system for nearly one week after Sanchez's resignation from Hanger in October 2006. At this time, Rosales had already signed his employment agreement with Capstone. Sanchez, who had worked with Rosales for several years, sent a job inquiry to, and began working for, Capstone, while Rosales remained at Hanger. Sanchez and Rosales then later ended-up working together again at Capstone's Tracy location.

Both the Visalia and Tracy patient care centers experienced significant declines in monthly sales shortly before Kimzey, Fulton, and Rosales left Plaintiff's employment. Capstone's patient records also demonstrate that numerous prosthetic and orthotic patients formerly seen at Hanger in Tracy and Visalia are now Capstone customers, and that Ellis, Kimzey, and Rosales began seeing such patients shortly after leaving Hanger. Capstone's patient records also reveal that several of their patient files for Visalia include duplicate copies of materials contained in Hanger's patient files. Finally, Hanger's expert

1   opines that the Visalia and Tracy patient care facilities both experienced sharp drops in

2   net sales during the month prior to each of Kimzey's and Rosales' departures from

3   Hanger.  Further, she states that there seems to be no other explanation for the drop in

4   sales as there were not any significant changes in market conditions or technology.

### 2.    Indirect Misappropriation

6       "The owner of the trade secret is protected ... against the appropriation of the

7   secret by improper means and the subsequent use or disclosure of the improperly

8   acquired secret." *Cadence Design Systems, Inc. v. Avant! Corp.*, 29 Cal. 4th 215, 222

9   (2002).  "[A] misappropriation within the meaning of the UTSA occurs not only at the

10  time of the initial acquisition of the trade secret by wrongful means, but also with each

11  misuse or wrongful disclosure of the secret." *Id.* at 223.  For instance, "[e]mploying the

12  confidential information in ... soliciting customers through the use of trade secret

13  information ... constitute[s] [misappropriating] use." *PMC, Inc. v. Kadisha*, 78 Cal. App.

14  4th 1368, 1383 (2000).  (citation omitted).

15      Finally, Capstone and Ellis may be liable for indirect misappropriation if Capstone

16  employees used Hanger patient files to solicit patients from Hanger, (*Steinbegt Moorad*

17  *& Dunn, Inc. v. Dunn*, 2002 WL 31968234, at *23-24 (C.D. Cal. Dec. 26, 2002)) as well

18  as on theories of agency.

### C.    Defendants Converted Plaintiff's Property

20      Under California law, a claim of conversion requires "plaintiff's ownership or

21  right to possession of property; defendants' wrongful act toward or disposition of the

22  property, interfering with plaintiff's possession; and damage to plaintiff." *McKell v.*

23  *Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1491 (2006).

24      The misappropriation and sale of the intangible property of another without

25  authority from the owner is conversion.  *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d

26  554 (1977); *Palm Springs-La Quinta Development Co. v. Kieberk Corp.*. 46 Cal. App. 2d

27  234, 240-41 (1941) (destruction and appropriation of lead cards containing the names and

28  valuable information regarding plaintiff's prospective and actual customers is

1   conversion); *Greenly v. Cooper*, 77 Cal. App. 3d 382, 392 (1978) (list of customers or

2   subscribers "built up by ingenuity, time, labor and expense of the owner over a period of

3   many years is property of the employer").

4          Hanger's patient lists and business forms are "property" and use of those lists and

5   forms for the benefit of Capstone is conversion.  Hanger is the sole and exclusive owner

6   of its patient-customer list, and as such is "entitled to the possession thereof [and] the

7   information thereon set forth."  Defendants' acquisition and use of Plaintiff's property

8   without authority is unlawful conversion.

9       **D.    Defendants Interfered With Hanger's Prospective Economic**

10           **Advantage**

11          The tort incorporates the following elements:  (1) an economic relationship

12   between the plaintiff and some third party, with the probability of future economic

13   benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional

14   acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption

15   of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts

16   of the defendant.  *See Youst v. Longo*, 43 Cal.3d 64, 71, n.6 (1987).  Plaintiff (1) suffered

17   lost profits ranging from $154,077 to at least $238,244 through July 2007; (2) incurred

18   out-of-pocket expenses of at least $59,136; and (3) estimates its future economic losses to

19   be not less than $150,000, but evidence of such damages shall be presented at trial on a

20   patient-by-patient analysis.

21          Intent may be established by inference as well as by direct proof.  *Korea Supply*

22   *Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003) (sufficient that defendant

23   knew interference was certain or substantially certain to occur as a result of its action).

24   The intentional act on the part of the defendant must be an independently wrongful and

25   unlawful act.  *Reeves v. Hanlon*, 33 Cal. 4th at 1152.

26          Defendants obtained Hangers's confidential information and used such

27   confidential information to solicit Hanger's patients and disrupt those relationships.

28   Plainly there exists a potential future economic benefit between Plaintiff and its patient-

21

1    customers.  Moreover, Defendants were well aware of Plaintiff's relationships with its

2    patient-customers and the potential future benefit of those relationships.

3        Further, as explained in more detail with respect to Hanger's breach of contract

4    action, Ellis violated the non-solicitation clause of his employment agreement by

5    proactively soliciting Hanger employees that he formerly supervised as a senior

6    executive.  This independently wrongful conduct provides another basis for Plaintiff's

7    interference claim.  *See Reeves*, 33 Cal. 4th at 1152-1153 (inducing the termination of at-

8    will employment relation may be actionable under the standard applicable to claims for

9    intentional interference with prospective economic advantage).

10       **E.    Defendants Engaged In Unfair Business Competition**

11       A number of doctrines are "subsumed under the umbrella" of common law unfair

12   competition. *City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 842

13   (9th Cir. 2004).  The tort of unfair competition under California law comprises the

14   following elements: (1) the party asserting the claim invested substantial time, skill or

15   money in developing its confidential business information; (2) the party against whom

16   the claim is being asserted obtained and used the confidential business information at

17   little or no cost; (3) the party against whom the claim is being asserted used the

18   confidential business information of the party asserting the claim without authorization;

19   and (4) the party asserting the claim was injured.  *See Balboa Ins. Co. v. Trans Global*

20   *Equities*, 218 Cal. App. 3d 1327, 1342 (1990); *City Solutions*, 365 F.3d at 842.

21       Where a party is found liable for common law unfair competition, it may also be

22   liable for damages. *See City Solutions*, 365 F.3d at 842-843.  The damages may consist

23   of lost profits or damage to reputation caused by the use or disclosure of the confidential

24   information. *Id.*

25       In addition to common law unfair competition, California has a statute allowing a

26   court to enjoin unfairly competitive acts.  *See Balboa Ins. Co. v. Trans Global Equities*,

27   218 Cal. App. 3d 1327, 1342 (1990).  Business and Professions Code section 17200

28   provides, in relevant part: "unfair competition shall mean and include any unlawful,

22

1  unfair or fraudulent business act or practice ….”  With respect to the “unlawful” prong of

2  section 17200, on which Hanger basis its unfair competition claims, the California

3  Supreme Court has held that “[t]he Legislature intended this ‘sweeping language’ to

4  include ‘anything that can properly be called a business practice and that at the same time

5  is forbidden by law.’ ”  *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992)

6  (citation omitted).  Section 17200 creates liability for unlawful, unfair, or fraudulent

7  business practices.  *Cel-Tech Commc’ns., Inv. V. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163,

8  180 (1999).[2]

9       “[T]he cases are legion holding that a former employee’s use of confidential

10  information obtained from his former employer to compete with him and to solicit the

11  business of his former employer's customers, is regarded as unfair competition.”

12  *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1292 (1990)

13  (citation omitted).

14       Kimzey, Fulton, and Rosales obtained Plaintiff’s confidential information for the

15  benefit of Capstone while still employed by Hanger.  Further, all Defendants used such

16  confidential information to gain an improper advantage with Plaintiff’s patient-

17  customers.  Moreover, Kimzey, Fulton, and Rosales breached their fiduciary duties /

18  duties of loyalty in taking Plaintiff’s confidential information.  *See, e.g., Huong Que,*

19  *Inc. v. Luu*, 150 Cal. App. 4th 400, 411 (2007) (agent assumes “a fiduciary duty to act

20  loyally for the principal’s benefit in all matters connected with the agency relationship”).

21       Capstone and Ellis are liable for unfair competition based on the actions of

22  Kimzey, Fulton and Rosales.  In *Bancroft v. Whitney v. Glen*, 64 Cal. 2d 327 (1966), the

23  court found defendant corporation and its owner liable for unfair competition because

24  _____

25  [2] In the Joint Pretrial Statement, Defendants included in their statement of disputed
   legal issues whether Hanger can establish conduct that threatens an incipient violation of

26  anti-trust law to establish an unfair business practice.  *See* Dkt. # 119, at 30:3-5.
   However, such a showing is only required where a claim for unfair competition is based

27  on an “unfair” act or practice.  *See Cel-Tech Communications, Inc. v. Los Angeles
   Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999).  As Hanger has made clear, its

28  unfair competition claims are based on unlawful and/or fraudulent acts.

23

1   they cooperated with and reaped the benefits of its competitor employee's breach of

2   fiduciary duty. *See id.* at 353. The court found that the owner and his company could be

3   held liable because they "encouraged the sowing and reaped the benefit [and] cannot now

4   disclaim the burden." *Id.*

5       **F.    Defendants Engaged In Civil Conspiracy to Commit Torts**

6         "Civil conspiracy is not a cause of action, but a legal doctrine that imposes

7   liability on persons who, although not actually committing a tort themselves, share with

8   the immediate tortfeasors a common plan or design in its perpetration." *Applied*

9   *Equipment Corp.*, v. *Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-511 (1994) (citation

10   omitted). But the civil conspiracy doctrine permits tort recovery against all co-

11   conspirators for wrongful conduct, and here Plaintiff has alleged multiple torts. The

12   elements of civil conspiracy are the formation and operation of the conspiracy, a

13   wrongful act done in the furtherance of the conspiracy, and the resulting damage to the

14   plaintiff. *See Applied Equipment Corp.* 7 Cal. 4th at 511. "By participation in a civil

15   conspiracy, a coconspirator effectively adopts as his or her own the torts of other

16   coconspirators within the ambit of the conspiracy." *Id.* As a result, a co-conspirator

17   incurs tort liability co-equal with the immediate tortfeasors. *See id.*

18         The threshold requirement for a civil conspiracy is the formation of a conspiracy

19   by two or more persons who have agreed on a common plan to commit a tortious act.

20   *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995). The co-

21   conspirators must have "actual knowledge that a tort is planned and concur in the tortious

22   scheme with knowledge of its unlawful purpose." *Id.* (citation omitted). Knowledge and

23   intent may be inferred from the circumstances, including the nature of the acts, the

24   relationship among the parties, and the interest of the conspirators. *See id.* A conspiracy

25   "need not be result of express agreement but may rest upon tacit assent and

26   acquiescence." *Holder v. Home Savings and Loan Ass'n*, 267 Cal. App. 2d 91, 108

27   (1968).

28   ///

PLAINTIFF'S TRIAL BRIEF
CASE NO. 2:06-CV-02879-GEB-KJM

SFCA_1390204.4

1       Evidence of involvement in a civil conspiracy does not always require overt

2   action. *See Mox, Inc. v. Woods*, 202 Cal. 675, 677-678 (1927). "[T]he major

3   significance of the conspiracy lies in the fact that it renders each participant in the

4   wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong,

5   irrespective of whether or not he was a direct actor and regardless of the degree of his

6   activity." *Id.*

7       Here, Defendants came to a "meeting of the minds" to commit wrongful acts

8   against Plaintiff and for the benefit of Capstone, in fact such wrongful acts were

9   committed, and Plaintiff was damaged as a result.

10      **G.    Defendants Ellis, Kimzey, and Rosales Breached Agreements**

11             **Regarding Their Employment by Hanger**

12      Breach of contract under California law requires the: (1) existence of a contract,

13  (2) performance by the plaintiff or excuse for nonperformance, (3) breach by the

14  defendant, and (4) damages. *First Commercial Mortgage Co. v. Reece,* 89 Cal. App. 4th

15  731, 745 (2001).

16          **1.    Ellis**

17      Ellis executed an "Employment Agreement" with Hanger on March 31, 2001.  The

18  agreement referenced the fact that Ellis would have access to sensitive and confidential

19  information in performing his job duties as a market leader.  Ellis and Hanger agreed that

20  Ellis would not proactively solicit Hanger employees for a 2-year period upon his

21  voluntary resignation.

22      Ellis immediately began soliciting Hanger employees following his departure from

23  Hanger on July 14, 2006.  Ellis offered employment agreements and ownership interests

24  to practice managers.  As CEO of Capstone, he offered to pay interim compensation and

25  health care during the period between departure from Hanger and the start date with

26  Capstone.  Ellis encouraged Hanger employees to send an email to the Capstone website

27  so as to circumvent the prohibitions against solicitation.

28  ///

SFCA_1390204.4

1

### 2.   Kimzey and Rosales

Kimzey and Rosales signed a "Confidentiality Acknowledgment/Training Attestation" relating to the access, use and disclosure of confidential information, such as patient, financial, and operational information.  Specifically, Kimzey and Rosales agreed in writing to protect such confidential information by, *inter alia*, (1) only accessing and using it for proper business purposes; (2) never accessing or using it for personal interest or advantage; (3) never showing, discussing, or disclosing it to/with anyone without a "need to know"; (4) never attempting to learn or use another employee's computer password or logon code; and (5) returning all of it upon termination of employment.

### H.   Rosales, Kimzey, and Fulton Breached Their Duties of Loyalty to Hanger and Their Fiduciary Duty as Hanger Employees

The elements of a cause of action for breach of a duty of loyalty are as follows: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach.  *See Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (Cal. App. 2007).  The duty of loyalty arises not from a contract but from the relationship of principal and agent.  *See id*.  Where such a relationship arises, the agent assumes "a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."  *Id.* at 411.

All employees owe a duty of loyalty to their employers.  *Otsuka v. Polo Ralph Lauren Corp.*, 2007 WL 3342721, *2 (N.D. Cal. Nov. 9, 2007).

Some employees also owe fiduciary duties to their employers.  The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach.  *See City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 483 (1998) (citation omitted).  A fiduciary relationship arises "where a confidence is reposed by one person in the integrity of another, and … the party in whom the confidence is reposed, … voluntarily accepts or assumes to accept the confidence[.]"  *Barbara A. v. John G.*,

///

26

SFCA_1390204.4

1  145 Cal. App. 3d 369, 382 (1983).  Generally, the existence of a confidential relationship

2  is a question of fact for the jury or the trial court.  *See id.* at 383.

3      Kimzey and Rosales entered into employment agreements with a competing

4  business to perform the same duties and in the same locations, all the while continuing on

5  with their employment at Hanger for several more months.  Kimzey and Fulton, using

6  another employee's computer and password, printed off a patient recall list which was

7  never seen again at Hanger's business premises.  Kimzey had previously told a co-worker

8  that he believed it was appropriate to take a patient list for his new business.  Kimzey also

9  told a co-worker that he was holding back work and working referral sources in

10  anticipation of his new business.

11      Fulton and Kimzey also connected a personal thumb drive to a desktop computer

12  in September 2006.  Fulton told a co-worker that she was downloading Hanger's business

13  forms.

14      The laptop computer that Fulton returned to Plaintiff on October 9, 2006, had been

15  subjected to the systematic, mass deletion of over 12,000 items, with deletion activity

16  occurring up to and including the date of return on October 9, 2006.  Finally, an external

17  mass storage device had been connected to Fulton's laptop and one of the Visalia desktop

18  computers containing voluminous patient information.

19      The password of Julia Sanchez, Rosales' long-time assistant and current employee

20  at Capstone, was used to access Hanger's computer system for nearly one week after

21  Sanchez's resignation in October 2006.  At that time, Rosales had already signed his

22  employment agreement with Capstone.  Sanchez, who had worked with Rosales for

23  several years, solicited a job opportunity from, and began working for, Capstone.

24  Sanchez and Rosales then later ended up working together again at Capstone's Tracy

25  location.

26      Although Capstone and Ellis do not have independent or direct liability to Hanger

27  for Rosales, Kimzey or Fulton acts of disloyalty to Hanger, if any one of these three

28  ///

PLAINTIFF'S TRIAL BRIEF
CASE NO. 2:06-CV-02879-GEB-KJM

SFCA_1390204.4

1  Hanger employees were acting as agents of Capstone while breaching this duty, then

2  Capstone and Ellis are liable for the acts of their agents.

3    **I.     Hanger's Claims are Not Preempted by The California Uniform Trade**

4        **Secrets Act**

5        In the Joint Pretrial Statement, Defendants raised for the first time the legal issue

6  of whether any of Hanger's claims are preempted by the California Uniform Trade

7  Secrets Act ("UTSA").  Hanger contends that Defendants waived any such argument by

8  failing to affirmatively plead the defense of preemption either in their Answer or in their

9  Motions for Summary Judgment.  Hanger further contends that, even had Defendants not

10  waived the argument, Hanger's claims for conversion, intentional interference with

11  prospective economic advantage, unfair competition, breach of contract, and breach of

12  fiduciary duty and duty of loyalty are not preempted by UTSA.

13    **J.     Defendants Are Not Entitled to Attorney's Fees**

14        Defendants stated in the Joint Pretrial Statement that defendant Rosales would be

15  moving for attorney's fees in connection with Hanger's California Penal Code § 502

16  claims, for which he obtained summary judgment.  The remaining defendants similarly

17  intend to seek attorney's fees in connection with Hanger's California Penal Code

18  § 502(c)(3) claims.  Defendants also stated their intention to seek attorney's fees as to

19  Hanger's trade secret misappropriation claim regarding its referral sources, a basis which

20  Hanger voluntarily determined not to actively pursue.  Finally, Defendants stated their

21  intention to move for attorney's fees in connection with any claims on which they may

22  prevail at trial.  *See* Dkt. # 119 at 37:8-18.

23        Hanger disputes that any of the defendants is entitled to attorney's fees for any

24  claim mentioned by Defendants in the Pretrial Statement, or for any claims on which any

25  defendant may prevail at trial.  Hanger intends to oppose any and all motions for

26  attorney's fees brought individually or jointly by the defendants.

27  ///

28  ///

28

1   **V.      REQUESTED RELIEF**

2          Hanger seeks monetary damages as follows:

3          A.      Compensatory and consequential damages as follows:

4                  1.      Past lost profits according to proof;

5                  2.      Future lost profits according to proof;

6                  3.      Out of Pocket expenses according to proof;

7                  4.      Prejudgment and postjudgment interest at the legal rate;

8                  5.      Statutory damages according to proof; and

9                  6.      An accounting of all revenues and profits received by Defendants as

10  a result of their misconduct.

11         B.      Attorneys' fees and costs; and

12         C.      Punitive Damages.

13  DATED: JUNE 3, 2008                              FOLEY & LARDNER LLP

14

15                                                  _____/S/_____
                                                    NANCY J. GEENEN
16                                                  AARON M. SCHWARCZ
                                                    ATTORNEYS FOR PLAINTIFF,
17                                                  HANGER PROSTHETICS &
                                                    ORTHOTICS, INC.

18

19

20

21

22

23

24

25

26

27

28

SFCA_1390204.4